GEORGE E. BLANCHETTE vs. CONTRIBUTORY RETIREMENT
APPEAL BOARD; MARLBOROUGH RETIREMENT BOARD,
intervener.

Middlesex. June 6, 1985. — July 30, 1985.

Present: GREANEY, C.J., BROWN, & WARNER, JJ.

*Retirement. Proximate Cause. Public Employment,* Accidental disability
retirement.

The Contributory Retirement Appeal Board, in upholding the decision of a
municipal retirement board denying an employee's application for disa-
bility retirement benefits under G. L. c. 32, § 7 (1), could properly
conclude that his mental disability, which had grown progressively more
acute over a considerable period of time, did not result from a single
work-related event or series of events relative to the performance of his
duties as a school custodian, or from any identifiable condition that
would distinguish his occupation from a wide variety of others where
employees face similar pressures and demands. [482-487]

CIVIL ACTION commenced in the Superior Court Department
on April 21, 1981.

The case was heard by *Gerald F. O'Neill, Jr.,* J.

*Edward J. Shagory* for the plaintiff.

*Holly Salamido,* Assistant Attorney General, for Contribu-
tory Retirement Appeal Board.

*Roy D. Toulan, Jr.,* for Marlborough Retirement Board,
intervener.

GREANEY, C.J. This action was brought in the Superior
Court pursuant to G. L. c. 30A, § 14, for review, under the
provisions of G. L. c. 32, § 16(4), of a decision made by the
Contributory Retirement Appeal Board. That decision upheld
the Marlborough retirement board's denial of the plaintiff's
application for accidental disability retirement under G. L.
c. 32, § 7(1). A judge of the Superior Court affirmed the
appeal board's decision, and the plaintiff has appealed. The

sole issue is the correctness of the appeal board's conclusion that the plaintiff had not sustained his burden of establishing a definite causal relationship between his mental disability and a personal injury sustained while in the performance of his duties as a school building custodian.

We summarize the facts found by the hearings officer with some supplementation from the record. These are the facts which were relied upon by the appeal board in reaching its decision. The plaintiff, a fifty-nine year old man, had been discharged from the United States Army in November of 1943 with a diagnosis of severe psychoneurosis. After his discharge, he received some treatment for a nervous condition. Thereafter, the plaintiff held various jobs requiring relatively little interpersonal contact. At those jobs, he had difficulty with his supervisors which often led to his quitting after a short period of time. In 1963, the plaintiff was employed by the Marlborough school committee as a roving custodian assigned to various schools.

In 1969, the plaintiff was appointed head custodian at an elementary school, where he was given supervisory authority over two other custodians. In his capacity as head custodian, the plaintiff had difficulty in communicating with both his superiors and his subordinates. The plaintiff testified that he believed that the principal at the school did not support him in conflicts with his subordinates, with the other custodians, or with the administration. Over the years, a number of incidents led to the plaintiff's feeling "persecuted" by his superiors. These incidents may be summarized as follows:

(1) Some time in 1972 or 1973, the plaintiff complained to the principal about the roving custodian, who he felt did not do his work and frequently left work early. Subsequently, the custodian assaulted the plaintiff in the school kitchen, calling him a "stoolie." The plaintiff went to the principal's office, where the principal physically intervened and told the plaintiff to leave the premises. The principal refused to allow the plaintiff use of his office telephone to call the police. Although the principal reported the incident to the superintendent of schools, no disciplinary action was taken against the other custodian.

(2) In 1972, the plaintiff left work early, with the principal's permission, to go to the hospital where his brother lay dying. The next week the plaintiff complained to the principal because his pay had been docked one-half day. The principal indicated that there was nothing he could do. The plaintiff made a special request to the school committee, and his pay was restored.

(3) In 1976, the plaintiff's father died. The plaintiff took off a Thursday and a Friday to attend the wake and funeral, and the following Monday to assist his mother in settling his father's affairs. His next paycheck was one day short, because the principal had interpreted the union contract's three-day bereavement clause as limited to three consecutive days. The plaintiff's pay was ultimately restored by the school committee.

(4) On March 3, 1977, a Thursday, the plaintiff left work an hour and one half early and did not return on Friday. On the following Monday, March 7, the plaintiff had a confrontation with the principal's secretary over whether he was required to sign a "sick slip." Later that day, the principal confronted the plaintiff in the school cafeteria and the two men argued over the need for a "sick slip."

(5) The following day, March 8, 1977, a second-grade girl dropped her tray of food on the cafeteria floor. The assistant principal told the plaintiff to clean up the mess. The plaintiff agreed to pick up the food and debris, but not the tray because he believed that school policy required the child to pick up her own tray. The assistant principal summoned the principal who ordered the plaintiff to pick up the tray. The plaintiff refused. The principal indicated that he intended to cite the plaintiff for insubordination and that a hearing would be held on Thursday, March 10, 1977.

(6) On March 10, the plaintiff arrived at the school in the early morning. He wrote a letter to the principal and left it on a desk in the boiler room. After the children had arrived and entered the building, the plaintiff went out to his automobile with his dog, connected a length of hose from the tailpipe to a side window, got in, and turned on the engine. At some point the plaintiff left the automobile and went to the school cafeteria, where he was found crying by his coworkers. He was

taken by ambulance to a nearby hospital and treated for carbon monoxide poisoning. The plaintiff was hospitalized for nineteen days under the care of the hospital's chief of psychiatry for a "psychotic depression reaction."

(7) During his stay in the hospital, the plaintiff was visited by the superintendent of schools, who presented the plaintiff with a petition stating that the teachers at the school did not want him to return. The plaintiff was discharged from the hospital on March 29, 1977, and has not worked since. On March 30, 1977, he applied for accidental disability retirement. The medical panel that examined the plaintiff pursuant to G. L. c. 32, § 6(3)(a), certified that he was permanently disabled from performing his duties as a custodian as the result of a psychotic depression and that the depression might be the result of his employment.

The plaintiff argues that the certification of the medical panel, considered along with the medical evidence in the case, conclusively established a causal relationship between his disability and a personal injury occurring in the performance of his duties as a custodian and, as a consequence, that the appeal board's denial of accidental disability retirement benefits has no support in the record. We disagree.

In order to qualify for accidental disability retirement under G. L. c. 32, § 7(1), as appearing in St. 1982, c. 630, § 18, an applicant must prove permanent and total disability "by reason of a personal injury sustained or a hazard undergone as a result of, and while in the performance of, his duties at some definite place and at some definite time."[1] The parties do not dispute that the plaintiff's psychotic depression may constitute a "personal injury" within the meaning of G. L. c. 32, § 7(1), so as to qualify for accidental disability retirement benefits. Emotional disability may constitute a personal injury within the meaning of the workers' compensation act, G. L. c. 152, see *Kelly's Case,* 394 Mass. 684, 686 (1985), and the term "personal injury" is given the same meaning under G. L. c. 32. *Zavaglia* v. *Contributory Retirement Appeal Bd.,*

---

[1] The "hazard undergone" prong of the statute is not involved in this case.

345 Mass. 483, 486 (1963). The crucial question here is causation — has the plaintiff's disability been shown to have been the natural and proximate result of a personal injury sustained as a result of the performance of his duties as school custodian?

The plaintiff had the burden of establishing the requisite causal nexus. See *Hough* v. *Contributory Retirement Appeal Bd.*, 309 Mass. 534, 540 (1941); *Wakefield Contributory Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 352 Mass. 499, 502 (1967). The medical panel's certification as to the plaintiff's condition (that his disability "might be the natural and proximate result" of a personal injury which the plaintiff sustained as a result of his employment) is not conclusive of the ultimate fact of causal connection but stands only as some evidence on the issue. *Wakefield Contributory Retirement Bd.* v. *Contributory Retirement Appeal Bd., supra.* The final determination in this case whether causation was proved was reserved to the appeal board, based on the facts found and all the underlying evidence, including both the medical and nonmedical facts.[2]

---

[2] As required by G. L. c. 32, § 16(4), the plaintiff's appeal from the decision of the local board which had denied him accidental retirement was assigned by the appeal board to a hearings officer for the purpose of determining the facts. See the procedure described in *Namay* v. *Contributory Retirement Appeal Bd.*, 19 Mass. App. Ct. 456, 461-462 (1985). The parties submitted the case to the hearings officer on the transcript of the testimony and the exhibits before the local retirement board, and no new testimony or evidence was heard or submitted. With some doubt, the hearings officer recommended that the plaintiff's application be granted. The appeal board was not bound by the hearings officer's recommendation, *Vinal* v. *Contributory Retirement Appeal Bd.*, 13 Mass. App. Ct. 85, 101-102 (1982), and since none of the hearings officer's findings of fact was based on credibility, the findings were only entitled to "some deference" by the appeal board. *Ibid.* The record before the appeal board in this case was the record before the hearings officer and the appeal board was thus in the same position as the latter to decide the application, including whether the burden of proof had been met. Cf. *Boston Safe Deposit & Trust Co.* v. *Commissioner of Rev.*, 17 Mass. App. Ct. 326, 327-329 (1983). The appeal board's decision agreed with the decision of the local board, which concluded, after hearing the plaintiff's medical expert and considering the other medical evidence, that causation had not been established. In the circumstances, we think the appeal board satisfied its responsibility to give an articulation of the reasons underlying its rejection of the hearings officer's decision. *Ibid.*

The general picture revealed that the plaintiff's mental problems were of long duration, reaching as far back as 1943, when he was discharged from military service with a diagnosis of psychoneurosis. He subsequently received some medical treatment for a nervous condition. Between 1943 and 1963 he unsuccessfully held a variety of jobs, most of which lasted for a few months to two years. In practically all his jobs, the plaintiff had recurring problems and frequent arguments with his supervisors, and he usually felt that he was being harassed. He quit many jobs after a short time. The same problems beset his employment in the Marlborough schools, which was marked by frequent conflicts with coworkers and supervisors and by feelings of persecution.

The chairman of the medical panel submitted a letter which was admitted in evidence. This doctor indicated that "[f]or years [the plaintiff] feels that he has been harassed and picked on by people, and cannot understand what he does to deserve such treatment." Based on a review of the plaintiff's history, this doctor found "long standing problems in [the plaintiff's] ability to get along with people." He also indicated that there was a paranoid quality to the plaintiff's thinking and that the plaintiff "blames everyone else for his problems and does not see what he does that might not be right." This doctor did not offer an opinion as to the cause of the plaintiff's disability.

The plaintiff's treating physician, a psychiatrist who was also a member of the medical panel, testified that he could not determine how much any of the specified stressful events, described in (1) through (7), might have contributed to the plaintiff's injury, but he felt that the letter from the teachers was "the final devastating blow." When asked what factors might entitle the plaintiff to accidental disability retirement, this doctor pointed to two factors: (1) a severe depression which had developed over a number of years related to the difficulties the plaintiff was having at work; and (2) a thinking problem, in the nature of a "prolonged disability," which also arose over a lengthy period of time and caused the plaintiff to perceive everyone at the school as "out to get him." When asked whether the plaintiff's current disability was causally connected to his

employment, this doctor offered only a conclusory and ambiguous response. He also offered the opinion that the plaintiff should have chosen a job "in which he worked alone and not in concert with a large group of people."[3]

We think that the facts and evidence in this case, particularly the medical facts and evidence, could reasonably have been viewed by the appeal board as failing to establish an entitlement, under G. L. c. 32, § 7(1), to accidental disability retirement benefits. In order to succeed on his application, the plaintiff had to prove one of two hypotheses: that his disability stemmed from "a single work-related event or series of events,"[4] *Kelly's Case,* 394 Mass. 684, 688 (1985); or, if the disability was the product of gradual deterioration, that "the employment [had] exposed [the plaintiff] to 'an identifiable condition . . . that is not common and necessary to all or a great many occupations.'" *Ibid.,* quoting from *Zerofski's Case,* 385 Mass. 590, 595 (1982). Proof of either hypothesis had to satisfy the strict causation standard imposed by the controlling statute: that the plaintiff's employment was "a natural and proximate cause of the incapacity." *Campbell* v. *Contributory Retirement Appeal Bd.,* 17 Mass. App. Ct. 1018 (1984).

As for the first hypothesis, based on the testimony of the plaintiff's treating physician (considered along with the evidence furnished by the physician who chaired the medical panel), the appeal board would have been warranted in concluding: (1) that the plaintiff's mental infirmity resulted, not from a single work-related event or series of events, but from gradual mental deterioration beginning as far back as 1943; and (2) that the infirmity involved severe depression and paranoid thinking problems, largely self-induced, which had grown

---

[3] This opinion received further support in the testimony of one of the plaintiff's previous supervisors (a school principal), who stated that the plaintiff "was a difficult person as I saw him in that he didn't complete something unless it was something that he wanted to do, and that's about it. . . ."

[4] As *Kelly's Case* makes clear (at 687), the specific event or series of events need not be unusually stressful or traumatic to support a recovery so long as the event or events in fact cause the disability.

progressively more acute over a considerable period of time.[5] So viewed, the proof did not show, as it must to sustain a finding on causation, a direct and perceptible connection between the plaintiff's personal injury and the performance of his duties "in the places where he worked and during the hours of his work." *Zavaglia* v. *Contributory Retirement Appeal Bd.*, 345 Mass. at 487.[6]

---

[5] The plaintiff's reliance on *Kelly's Case, supra,* to establish causation is misplaced. In *Kelly's Case,* the single member had determined with finality that the employee's emotional disability had *in fact* been caused by notice to her that she was going to be laid off or transferred. 394 Mass. at 686. The only question was whether her disability could be said to "arise out of and in the course of employment" within the meaning of G. L. c. 152. *Ibid.*

In this case, the appeal board found no causation *in fact,* and there are clear factual distinctions between this case and *Kelly's Case, supra.* Most significant, in *Kelly's Case* there was no evidence that the plaintiff had a preexisting mental disorder or was subject to outside stress, and, as the single member found, the layoff and transfer were the *sole cause* of Kelly's mental illness (emphasis supplied). Similar distinctions set this case off from other cases in the *Kelly* line of decisions, such as *Fitzgibbons's Case,* 374 Mass. 633 (1978), and *Albanese's Case,* 378 Mass. 14 (1979).

[6] The appeal board was free to draw its own inferences from the conclusory and somewhat contradictory testimony of the plaintiff's treating physician on the issue of the plaintiff's working conditions. This doctor testified that the medical panel's original assessment was that the plaintiff "had gone through the usual, ordinary stresses and strains of any employee" but that the petition delivered to the plaintiff at the hospital "somewhat changed our opinion." This doctor went on to say that he was surprised by the petition incident, because none of the other incidents which had occurred before the plaintiff's suicide attempt was out of the ordinary. Upon further questioning, it came out that prior to the delivery of the petition, the plaintiff had made a threat on the principal's life, and that his conduct might have been viewed by the average person as intimidating. The appeal board would have been justified in concluding, based on its own experience, that the stresses which the plaintiff experienced with his superiors at work could have been expected in most employment situations and that the incident involving the petition was not an abnormal response to behavior by the plaintiff which may have been perceived by others as dangerous and threatening to the safety of the children and other staff at the school. We note further that the delivery of the petition to the hospital took place after the plaintiff had made his suicide attempt, and after he had been diagnosed as suffering from a psychotic depression reaction. The board thus could have viewed the petition incident as subsequent to the occurrence of the injury and therefore not the cause of it.

As for the second hypothesis, the board could have reasoned that the plaintiff had not shown anything peculiar in his work as a school custodian which would distinguish his occupation from a wide variety of other occupations where employees face similar pressures and demands. Thus, the appeal board could have determined that there was nothing to show, in any of the alleged stressful events, and in particular the petition incident, see note 6, *supra,* that the plaintiff's disability involved gradual deterioration due to exposure to "an identifiable condition . . . that is not common and necessary to all or a great many occupations."[7] *Kelly's Case,* 394 Mass. at 688, quoting from *Zerofski's Case,* 385 Mass. at 595. At best, the proof tended to show that the plaintiff's work contributed in some way to his problems along with many other stresses felt outside the workplace. But as was made clear in *Campbell* v. *Contributory Retirement Appeal Bd.,* 17 Mass. App. Ct. at 1018, when work is merely a contributing cause of the injury the "natural and proximate result" test for causation necessary to the recovery of accidental disability retirement benefits under G. L. c. 32, § 7(1), has not been satisfied.

In upholding the decision of the appeal board, we have given consideration to: (a) the board's experience in the area and its function in applying the controlling statute, necessarily on a case-by-case basis, to a difficult area of the law; and (b) its responsibility to differentiate between the special requirements for an accidental disability retirement and the requirements for other benefits, such as ordinary disability retirement pursuant

---

[7] Recovery of accidental disability benefits for gradual deterioration stemming from an "identifiable condition" which is not shared by many occupations could involve, for example in the case of physical injury, diseases such as asbestosis, silicosis, and mesothelioma related to exposure to asbestos. Mental incapacity might occur, for example, in occupations involving constant exposure to life threatening situations or to continual traumatic or depressing events. However, it should be noted that the "identifiable condition" spoken of in *Kelly's Case* need not necessarily be unique to the occupation in order to warrant a recovery. See *Kelly's Case, supra* at 688. The key, in a case involving G. L. c. 32, § 7(1), once the physical or mental disability is established, is proof that the identifiable condition at work is an efficient cause of the disability.

to G. L. c. 32, § 6(1), for which the plaintiff might qualify but for which he apparently did not apply. We have also borne in mind where the burden of proof lies, and the appeal board's prerogative in this case, see notes 2 and 6, *supra*; cf. *Boston Safe Deposit & Trust Co.* v. *Commissioner of Rev.*, 17 Mass. App. Ct. 326, 327-329 (1983), to decide the probative value of the evidence, and to reject the opinion of an essential medical expert which was, at best, equivocal. See *Campbell* v. *Contributory Retirement Appeal Bd.*, *supra.* Compare *Maddocks* v. *Contributory Retirement Appeal Bd.*, 369 Mass. 488, 495 (1976).

*Judgment affirmed.*