WALTER FENDER *vs.* CONTRIBUTORY RETIREMENT APPEAL
BOARD & another.[1]

No. 07-P-621.

Suffolk. January 14, 2008. - October 3, 2008.

Present: PERRETTA, LENK, & SIKORA, JJ.

*Contributory Retirement Appeal Board. Public Employment,* Accidental disability retirement.

Discussion of the standard of review applicable to decisions of the Contributory Retirement Appeal Board, and the criteria rendering such decisions capable of meaningful judicial review. [759-760]

Discussion of the elements of a viable claim pursuant to G. L. c. 32, § 7, for accidental disability retirement benefits resulting from personal injury sustained in the form of emotional disability. [760-761]

This court declined to disturb the conclusion of the Contributory Retirement Appeal Board that an applicant for disability retirement benefits based on emotional disability caused by his work as a superintendent of a town's department of public works failed to satisfy his burden to demonstrate, under one of the available theories of recovery, an identifiable condition not common and necessary to all or a great many occupations, where stress caused by job pressures, including increasing demands by superiors and unfilled department vacancies, was common to management positions. [761-762]

In hearing a claim for accidental disability retirement benefits, the Contributory Retirement Appeal Board had no basis to exclude from a series of work-related events upon which the plaintiff premised his claim a meeting of his employer's board, where there was no evidence to support a finding that the plaintiff's disability arose principally out of that meeting. [762-763]

On a claim for accidental disability retirement benefits, the decision of the Contributory Retirement Appeal Board (CRAB) did not permit meaningful judicial review when it concluded, without explanation, that the plaintiff manager, who was unable to return to work as the superintendent of a town's department of public works following a suicide attempt and diagnosis of major depressive disorder, was not eligible for accidental disability retirement benefits under the "series of work-related events" genesis hypothesis, because he had not suffered a personal injury within the appropriate statutory definition of that term by virtue of the death of a pivotal employee, that employee's replacement's suicide attempt, and another employee's death from a highly infectious disease [763-764]; accordingly,

[1]Plymouth County retirement board.

this court vacated that portion of a Superior Court judge's decision affirming CRAB's conclusion on this issue and remanded the matter to CRAB for a redetermination of the plaintiff's entitlement to disability retirement benefits accompanied by a reasoned explanation of its reevaluation of the issue, and to include any necessary fact finding [764-765].

CIVIL ACTION commenced in the Superior Court Department on March 28, 2006.

The case was heard by *Charles T. Spurlock*, J., on motions for judgment on the pleadings.

*Vincent A. Murray, Jr. (Scott D. Ford* with him) for the plaintiff.

*Michael Sacco* for the defendants.

LENK, J. Walter Fender was employed by the town of Marshfield in its department of public works (DPW or department) for approximately eight years. Following a difficult and stressful nine-month tenure as the department's superintendent, Fender attempted suicide, was diagnosed with a major depressive disorder, and was unable thereafter to return to work. The Plymouth County retirement board rejected his application for accidental disability retirement benefits pursuant to G. L. c. 32, § 7, and this denial was subsequently upheld by both the Contributory Retirement Appeal Board (CRAB) and a judge in the Superior Court.

Fender appeals, arguing that the great weight of the evidence supports the conclusion that his permanent disability was caused both by an identifiable, uncommon workplace condition and by a series of work-related events, and that he is thus entitled to accidental retirement disability benefits. Because CRAB failed to explain the basis of its conclusion regarding several of the events proffered by Fender to satisfy his evidentiary burden, the matter must be remanded for further proceedings.

*Background.* The following facts either were found by the division of administrative law appeals magistrate or are drawn from the materials and testimony specifically cited by the magistrate in support of these findings. Beginning in 1995, Fender was employed in the department, working primarily as town engineer. For approximately eight months in 1998, Fender functioned as both town engineer and acting superintendent of the DPW. Thereafter he again worked full time as town engineer.

At or about the end of 2001, Fender again became acting superintendent of the DPW. In January of 2003, Fender was promoted to the position of superintendent. One month later, Marshfield experienced 51.3 inches of record snowfall, straining the capacity of Fender and the DPW to respond adequately, and causing Fender to worry whether the department could handle any further snow that season. In March, about two months after Fender's promotion to superintendent, Joe Roderick, who had been head of the Marshfield operations department[2] for some forty years, passed away unexpectedly. Roderick had been an integral part of the operations department as well as the main liaison between management and the union; his passing was a considerable loss to Fender.

Throughout the spring and summer of the same year, 2003, Marshfield experienced a severe seaweed problem on its beaches, which fell to the DPW to resolve. Its budget, however, did not include allocations for the extensive and unexpected cleanup expenses that proved necessary. In addition, Fender had to deal with conflicting complaints from those who worried about the environmental impact of cleanup machinery and those who were eager to use the beaches, causing Fender to experience further stress.

Then, in August of that year, Joe Davis, Roderick's replacement in the operations department, attempted suicide with a shotgun; Davis did not return to work thereafter. Before taking the job as head of the operations department, Davis had been the highway supervisor, a position that was filled by an equipment operator when Davis became head of operations. When Davis did not return to work, the same equipment operator took over as the head of operations. The equipment operator position remained unfilled throughout this time period.

Shortly thereafter, a DPW employee in the engineering department[3] died of Legionnaires' disease. This caused hysteria in Marshfield and within the DPW because of the highly infectious nature of the disease. It also created yet another vacancy

---

[2]The operations department is a subdivision of the Marshfield DPW; Roderick reported to Fender, the superintendent.

[3]As with the operations department, the engineering department is a subdivision of the DPW under the purview of the superintendent.

within the already short-staffed department with which Fender had to contend, amplifying his feelings of stress.

Throughout August and September, 2003, Fender was working up to fifteen hours per day in the department and also attending evening town meetings. Fender worked throughout the day on Saturday, September 13, 2003, to prepare for a budget meeting scheduled for the following Monday. On that Monday, September 15, 2003, the air conditioning system malfunctioned in the highway garage, and staff members threatened Fender that they would leave work unless the cooling system was fixed.

At that evening's DPW board meeting — a meeting that lasted until 11:00 P.M. — Fender and his supervisors discussed the performance of the DPW and of Fender himself. In particular, there was discussion about creating goals, tied to compensatory incentives, for Fender to accomplish. The board also criticized Fender's management style.

On Tuesday, September 16, 2003, Fender worked but did not feel well. He felt as though he was unable to keep up with the work demanded of him. The next day, Fender did not go to work but walked the beach contemplating suicide. On Thursday, September 18, 2003, Fender unsuccessfully attempted suicide by slicing his wrists and taking an overdose of Paxil. Over the next several months, Fender underwent a lengthy psychiatric hospitalization and psychotherapy, ultimately filing an application for accidental disability retirement benefits on March 17, 2004.

Fender's application cited "extreme work related stress resulting in severe clinical anxiety and depression leading to a serious suicide attempt." Fender listed as cause the above-described events. A regional medical panel, convened at the behest of the Plymouth County retirement board, examined Fender on August 13, 2004. The panel, comprised of two board-certified psychiatrists and one neurologist, answered unanimously in the affirmative to all certificate questions.[4] See G. L. c. 32, § 6(3). In re-

---

[4]The medical panel answered unanimously in the affirmative to the following standard certificate questions: "(1) Is the member mentally or physically incapable of performing the essential duties of his or her job as described in the current job description?" "(2) Is said incapacity likely to be permanent?" "(3) Is said incapacity such as might be the natural and proximate result of

sponse to a request for clarification from the Plymouth County retirement board, the medical panel further unanimously opined that "the personal injury sustained or hazard undergone [by Fender] which is the basis of the claimed disability is the continuing inadequate staffing for demands made upon the claimant by his superiors." On January 4, 2005, the Plymouth County retirement board denied Fender's application for accidental disability retirement benefits.

Fender timely filed an appeal with the division of administrative law appeals. After an evidentiary hearing, the magistrate affirmed the denial of benefits. In her memorandum of decision, the magistrate recited the above facts and concluded that Fender had not proved the requisite causal nexus between a work-related injury and his disability. Specifically, the magistrate concluded that the September 15, 2003, meeting with the DPW board constituted a noncompensable "bona fide, personnel action" within the meaning of G. L. c. 152, § 1(7A),[5] and could not be considered in the analysis of Fender's application. The magistrate also declined to include in the calculus the "two deaths and one suicide attempt in [Fender's] department"; they "cannot form the basis of [Fender's] claim," she stated, "because these events are not 'personal injuries' to [Fender]."

On March 6, 2006, CRAB adopted as its own the magistrate's findings of fact in their entirety and summarily affirmed her disposition of Fender's application. Pursuant to G. L. c. 30A, § 14, Fender took an appeal in the Superior Court; the judge there declined to disturb CRAB's conclusion.

*Discussion.* Judicial review of CRAB decisions under G. L. c. 32, § 7, is "narrow and highly deferential," *Sugrue* v. *Contributory Retirement Appeal Bd.*, 45 Mass. App. Ct. 1, 5 n.5 (1998), as reviewing courts give considerable deference to CRAB's experience and discretionary administrative authority. *Plymouth County Retirement Bd.* v. *Contributory Retirement*

the personal injury sustained or hazard undergone on account of which retirement is claimed?"

[5]By St. 1986, c. 662, § 6, G. L. c. 152, § 1(7A), was amended to include the following:

> "No mental or emotional disability arising *principally* out of a bona fide, personnel action . . . shall be deemed to be a personal injury . . ." (emphasis supplied).

*Appeal Bd.*, 60 Mass. App. Ct. 114, 119 (2003). A CRAB decision may only be set aside or modified if, "after giving due regard to CRAB's expertise . . . , the appellant has convincingly demonstrated that CRAB's decision was, considering the entirety of the record — including non-medical as well as medical facts . . . — based upon an error of law or wholly unsupported by substantial evidence." *Sugrue* v. *Contributory Retirement Appeal Bd.*, 45 Mass. App. Ct. at 5 n.5.[6] We take an approach "of judicial deference and restraint, but not abdication." *Arnone* v. *Commissioner of the Dept. of Social Servs.*, 43 Mass. App. Ct. 33, 34 (1997).

For its part, in order to enable meaningful judicial review, CRAB must with each decision provide "a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." G. L. c. 30A, § 11(8). Administrative decisions such as these must be based on substantial evidence as well as reasoned findings; this is what makes effective judicial review possible. "Although § 11(8) does not call for all agency decisions to include a lengthy statement of factual and legal conclusions, it does require an agency to make subsidiary findings of fact on all issues relevant and material to its decision and *to explain its reasons for reaching the conclusion(s) that it has based on those subsidiary findings*" (emphasis supplied). *Vinal* v. *Contributory Retirement Appeal Bd.*, 13 Mass. App. Ct. 85, 92 (1982). Without such guidance, reviewing courts are hampered in ascertaining whether CRAB "applied correct principles of law to the facts found" (citations omitted). *Ibid.*

With respect to the substance of an application for accidental disability retirement benefits, an applicant must show that he is "unable to perform the essential duties of his job and that such inability is likely to be permanent . . . by reason of a personal injury sustained . . . as a result of, and while in the performance of, his duties . . . ." G. L. c. 32, § 7(1), as amended by

[6]Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support [the decision at issue]." *Soucy* v. *Contributory Retirement Appeal Bd.*, 69 Mass. App. Ct. 558, 561 (2007), quoting from G. L. c. 30A, § 1(6). A lack of substantial evidence has been found in circumstances where "the cumulative weight of the evidence tends substantially toward opposite inferences." *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 391 (1999).

St. 1996, c. 306, § 14. It is well established that "[e]motional disability may constitute a personal injury within the meaning of the workers' compensation act, G. L. c. 152,[7] see *Kelly's Case*, 394 Mass. 684, 686 (1985), and the term 'personal injury' is given the same meaning under G. L. c. 32. *Zavaglia* v. *Contributory Retirement Appeal Bd.*, 345 Mass. 483, 486 (1963)." *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 482-483 (1985). See *Adams* v. *Contributory Retirement Appeal Bd.*, 414 Mass. 360, 361 n.1 (1993).

In order to establish his entitlement to accidental disability retirement benefits as a result of his emotional disability, Fender was required to prove "one of two hypotheses: that his disability stemmed from 'a single work-related event or series of events,' *Kelly's Case*, 394 Mass. [at] 688 . . . ; or, if the disability was the product of gradual deterioration, that 'the employment [had] exposed [Fender] to "an identifiable condition . . . that is not common and necessary to all or a great many occupations." ' *Ibid.*, quoting from *Zerofski's Case*, 385 Mass. 590, 595 (1982). Proof of either hypothesis had to satisfy the strict causation standard imposed by [G. L. c. 32, § 7(1)]: that [Fender's] employment was 'a natural and proximate cause of the incapacity.' *Campbell* v. *Contributory Retirement Appeal Bd.*, 17 Mass. App. Ct. 1018 (1984)." *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 485.

On appeal from the Superior Court judgment affirming CRAB's decision, Fender contends that CRAB erred in determining that he did not suffer a "personal injury" within the terms of G. L. c. 152 and, further, that he satisfied the requirements under both of the alternate theories of eligibility enunciated in *Blanchette* v. *Contributory Retirement Appeal Bd.*, *supra* at 485.

1. *Identifiable condition.* CRAB concluded that stress caused by job pressures, including increasing demands by superiors and

---

[7]General Laws c. 152, § 1(7A), as amended through St. 1991, c. 398, § 14, provides, in pertinent part:

"Personal injuries shall include mental or emotional disabilities only where the predominant contributing cause of such disability is an event or series of events occurring within any employment."

unfilled departmental vacancies, is common to management positions across a broad spectrum of employment and that Fender therefore did not satisfy his burden with respect to the second *Blanchette* theory. See *ibid.* We discern no error in CRAB's comparative analysis of different professions, an undertaking that was, in the circumstances of this case, properly within the province of its expertise. See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 257 (1996) (agency's "experience, technical competence, and specialized knowledge" granted deference). Nor do we detect anything in the evidence pointing to an "overwhelming probability" that CRAB erred in this analysis. *Cobble* v. *Commissioner of the Dept. of Social Servs.*, 430 Mass. 385, 391 (1999), quoting from *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981). Hence, we decline to disturb its conclusion in this regard.

2. *Work-related events.* As noted, a mental or emotional disability stemming from a series of work-related events has long been recognized as being a "personal injury" within the meaning of G. L. c. 152 on which a grant of accidental disability retirement benefits may properly be based. See *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 485; *Plymouth County Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 60 Mass. App. Ct. at 118. See also *Albanese's Case*, 378 Mass. 14, 14-15 (1979) ("We hold that if an employee is incapacitated by a mental or emotional disorder causally related to a series of specific stressful work-related incidents, the employee is entitled to compensation"); *Robinson's Case*, 416 Mass. 454, 458-460 (1993); *May's Case*, 67 Mass. App. Ct. 209 (2006). Fender relies upon the following series of events as having caused his disability: (1) the 51-inch snowfall, (2) the death of Joe Roderick, (3) the seaweed cleanup, (4) Joe Davis's suicide attempt, (5) the fatal case of Legionnaires' disease and its aftermath, (6) his onerous work schedule in August and September of 2003, (7) the threatened walkout by employees, and (8) the DPW board meeting on September 15, 2003.

As to the eighth event, the September 15, 2003, board meeting, Fender argues that it was error for CRAB to conclude, pursuant to G. L. c. 152, § 1(7A) (see note 5, *supra*), that the DPW board meeting was a "bona fide, personnel action," and thus did

not qualify as a triggering event for a personal injury.[8] It is true that the question whether a mental or emotional injury arises "principally out of a bona fide, personnel action" is normally within the scope of a magistrate's competence. *Robinson's Case*, 416 Mass. at 459 n.3. However, even if the subject board meeting was a "bona fide, personnel action," a matter we need not decide, CRAB conceded at oral argument that there was no evidence to support a finding that Fender's disability arose "principally" out of that meeting. We can thus discern no basis on which to exclude the DPW board meeting from the series of events that Fender contends gave rise to his personal injury.

With respect to Roderick's death, Davis's suicide attempt, and the employee's death from Legionnaires' disease, Fender does not contend that each such event itself caused the personal injury he sustained. He claims instead that each event carried in its wake direct "fallout," such as personnel vacancy and staffing concerns, that had a significant impact on him, each being part of the series of work-related events that gave rise to his personal injury. That is to say, Fender maintains that the increased workplace demands on him and the increased stress he experienced after and because of the deaths and suicide attempt, combined with all of the other events cited, together caused his disability. CRAB concluded without explanation that the three events could not form the basis of Fender's claim because the individual events themselves were not "personal injuries" to Fender. The view articulated by CRAB departs from the statutory definition of the term "personal injury" as set forth in G. L. c. 152, § 1(7A) (see note 7, *supra*), and from the construction of the term in relevant decisional law. See, e.g., *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. at 485 n.4 ("As *Kelly's Case* makes clear [394 Mass. at 687], the specific event or series of events need not be unusually stressful or traumatic to support a recovery so long as the event or events in fact cause the disability"); *May's Case*, 67 Mass. App. Ct. at 213, quoting from *Robinson's Case*, 416 Mass. at 460 ("[t]here is nothing in [G. L.

---

[8]Fender makes no argument that the "bona fide, personnel action" exception in G. L. c. 152, § 1(7A), should not be applied in the context of a G. L. c. 32, § 7, claim, and we do not consider it. Compare *Sugrue* v. *Contributory Retirement Appeal Bd.*, 45 Mass. App. Ct. at 4 n.4.

c. 152] to suggest that emotional disability is compensable only if it resulted from an 'unusual and objectively stressful or traumatic event.' . . . The finding that the employee's disability was causally related to a series of events at work is sufficient as long as those events [meet the required causal standard] bringing about the employee's disability").

Apart from its apparent misapprehension of the statutory language, CRAB's conclusory declaration regarding the deaths and suicide attempt, without more, does not permit meaningful judicial review of its decision. CRAB fails to provide a reasoned explanation that would illuminate the basis for its decision to disregard these incidents. Simply put, we cannot discern why the subject events were not factored into the analysis whether Fender's disability constituted a "personal injury" within the meaning of the statute and, if these events were to be considered, whether CRAB's conclusions as to Fender's eligibility for benefits would change.[9] We are left in the untenable position of not knowing which principles of law were applied to the facts found and why CRAB omitted the subject events from its inquiry. Under such circumstances, we must remand for clarification by the agency. See *Vinal* v. *Contributory Retirement Appeal Bd.*, 13 Mass. App. Ct. at 92-93; *Adams* v. *Contributory Retirement Appeal Bd.*, 26 Mass. App. Ct. 1032, 1035 (1989). See also *Retirement Bd. of Somerville* v. *Contributory Retirement Appeal Bd.*, 38 Mass. App. Ct. 673, 678-679 (1995), and cases cited.[10]

On remand, and consistent with the foregoing, CRAB is to review Fender's application for accidental disability retirement

---

[9]The question whether an emotional disability resulting from a series of work-related events constitutes a personal injury within the meaning of the statute is but one component of the analysis that must be undertaken with respect to an application for G. L. c. 32, § 7, benefits. Should CRAB's view of this aspect of the case change on remand, its ultimate decision on Fender's application for accidental disability retirement benefits may or may not also change.

[10]Inadequate written findings and analyses preventing meaningful judicial review of other administrative agencies' decisions have resulted in remands for clarification. See, e.g., *Caswell* v. *Licensing Commn. for Brockton*, 387 Mass. 864, 876-877 (1983); *Costello* v. *Department of Pub. Utils.*, 391 Mass. 527, 537, 542 (1984); *Foster from Gloucester, Inc.* v. *City Council of Gloucester*, 10 Mass. App. Ct. 284, 294-296 (1980); *Mayor of Revere* v. *Civil Serv. Commn.*, 31 Mass. App. Ct. 315, 323, 327 (1991).

benefits to the extent that his claim of a cognizable personal injury is predicated on the series of work-related events proffered. Because the "retirement law is notoriously complex," we "hope to have the benefit of [CRAB's] experience" by its further consideration of the issues and a fuller explanation of its reasoning. *Namay* v. *Contributory Retirement Appeal Bd.*, 19 Mass. App. Ct. 456, 463 (1985). "By no means are we saying that [CRAB] should find for [Fender]," *Yerardi's Moody St. Restaurant & Lounge, Inc.* v. *Selectmen of Randolph*, 19 Mass. App. Ct. 296, 301 (1985), nor are we endorsing the opposite result. Indeed, regardless of the outcome, CRAB must provide a reasoned explanation of both its reevaluation of this issue and any conclusions it may reach concerning Fender's eligibility for accidental disability retirement benefits under other relevant statutory criteria. Further fact finding, if necessary to satisfy the requirements of G. L. c. 30A, § 11(8), may also be undertaken.

*Conclusion.* The judgment of the Superior Court is vacated and a new judgment shall enter affirming the decision of CRAB insofar as it found that Fender was not eligible for disability retirement benefits under the "identifiable condition hypothesis," vacating the decision insofar as it found that Fender was not eligible under the "series of work-related events hypothesis," and recommitting the case to CRAB for a redetermination of Fender's entitlement to disability retirement benefits consistent with this opinion.

*So ordered.*