Macdonald, D. Lloyd, J.
Introduction and Procedural Overview
This is an administrative appeal pursuant to G.L.c. 30A, §14. The plaintiff, Gail Callahan (“Callahan”), seeks judicial review of a decision by the Contributory Retirement Appeal Board (“CRAB”). The State Board of Retirement (the “Board”) denied Callahan’s application for accidental disability benefits based on the Regional Medical Panel’s (the “Panel’s”) determination that she was not permanently disabled. Callahan appealed the Board’s decision to CRAB, which assigned the matter to the Division of Administrative Law Appeals (“DALA”). DALA via a decision of its magistrate affirmed the Board’s decision denying Callahan benefits. DALA concluded that Callahan had failed to demonstrate a compensable personal injury and that — as found by the Panel — she was not disabled. Callahan timely filed her objection to DALA’s decision with CRAB. CRAB reviewed the DALA decision and adopted its findings, affirming the decision denying Callahan benefits. Thereafter, Callahan filed her complaint for judicial review in this Court.
The matter is currently before the Court on Callahan’s Motion for Judgment on the Pleadings, requesting the court to vacate CRAB’s decision. Hie Court DENIES Callahan’s motion and AFFIRMS the decision below.
Factual Background
In 1992, Callahan began working as a secretary/receptionist at the University of Massachusetts Medical School (the “Medical School”). In 1993, she was promoted to database manager of Research Funding Services. Callahan worked as a database manager until her retirement in May 2005. During her first two years of employment, Callahan was supervised by David Entin (“Entin”), Director of Research at the Office of Research. Thereafter, from 1993 until 2002, she was supervised by Jill Martoli (“Martoli”), who succeeded Entin as the Director of Research. From 1992 through 2002, Callahan received annual performance evaluations from Entin and then Martoli. These performance evaluations indicated Callahan successfully met or exceeded job expectations.
In late 2002, Martoli resigned her position and was replaced by Patricia McNulty (“McNulty”). Callahan alleges her workplace problems began thereafter. McNulty’s first performance evaluation for Callahan, in spring 2004, covering the period January 1, 2003 to December 31, 2003 (the “2004 Evaluation”), criticized Callahan in many categories, stating she either needed improvement or did not meet standards. Callahan alleges that after the 2004 Evaluation she became very anxious and nervous about her job. According to Callahan, during the 2004 Evaluation, McNulty informed her that people inside and outside the Medical School were complaining about her attitude and performance, but McNulty refused to disclose who was making the complaints. In addition, Callahan claims that during the 2004 Evaluation, McNulty told her for the first time that work she had completed in October 2003, five months earlier, was “junk.”
Soon after receiving the 2004 Evaluation, in April 2004, Callahan learned McNulty and the Assistant Director of Research were searching for a new database program. Callahan claims she was excluded from the search process despite the fact that she was responsible for operating the database. According to Callahan, this increased her anxiety and worry. Next and more significant, according to Callahan, in June 2004, McNulty posted Callahan’s job description without telling her. Callahan states she learned about the posting from a co-worker who telephoned to ask her why she was leaving the Medical School. Callahan claims this greatly increased her anxiety and depression; she was constantly worried about her job and began having difficulty concentrating at work.
Following these events, Callahan asserts that physical manifestations of her stress and anxiety began to present themselves. At this time, she sought treatment from her primary care physician, Dr. Mary O’Brien (“Dr. O’Brien”), who diagnosed her with anxious depression, panic, fibromyalgia, lymphocytic colitis and irritable bowl syndrome (“IBS”). Thereafter, Callahan began seeing a therapist, Susan Thurston (“Thur-ston”). In March 2005, McNulty gave Callahan another negative performance evaluation, covering the period January 1, 2004 to December 31, 2004 (the “2005 Evaluation”). After receiving the 2005 Evaluation, dur *122 ing which McNulty told Callahan not to provide any information from her database to any administrator, Callahan became distraught. In describing this period of time, Callahan states she thought she “was having a nervous breakdown.” Despite her increased anxiety and depression, Callahan continued to work until May 28, 2005, at which point she requested and was granted Family Medical Leave for the period May 28, 2005 through September 2005. She retired with superannuation retirement benefits effective October 1, 2005.
Standard of Review
The scope of review of an agency’s decision is defined by G.L.c. 30A, §14. Howard Johnson Co. v. Alcoholic Beverages Control Comm’n, 24 Mass.App.Ct. 487, 490 (1987). Pursuant to G.L.c. 30A, §14, the court may affirm, remand, set aside or modify an agency’s decision if it determines that the substantial rights of any party may have been prejudiced because the agency’s decision is: (1) based upon an error of law; (2) unsupported by substantial evidence; (3) unwarranted by facts found by the court on the record submitted; or (4) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law. G.L.c. 30A, §14(7).
The party appealing an administrative decision bears the burden of demonstrating the decision’s invalidity. Merisme v. Board of Appeals on Motor Vehicle Liab. Policies and Bonds, 27 Mass.App.Ct. 470, 474 (1989). In reviewing the agency’s decision, the court is required to give due weight to the agency’s experience, technical competence, specialized knowledge, and the discretionary authority conferred upon it by statute. Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420 (1992).
The reviewing court may not substitute its judgment for that of the agency. Southern Worcester County Reg’l Vocational Sch. Dist. v. Labor Relations Comm’n, 386 Mass. 414, 420-21 (1982).
“The retirement law is notoriously complex, and in construing the effect of the provision in question, the court would hope to have the benefit of the experience of the appeal board. Courts look for and will normally accord great weight to an administrative agency’s interpretation — particularly if long standing — of the law which the agency is charged to administer." Namay v. Contributory Ret. Appeal Bd., 19 Mass.App.Ct. 456, 463 (1985), cited with approval, Fender v. Contributory Ret. Appeal Bd., 72 Mass.App.Ct. 755, 765 (2008), and Fairbairn v. Contributory Ret. Appeal Bd., 54 Mass.App.Ct. 353, 357 (2002).
“Substantial evidence” means such evidence as a reasonable mind might accept as adequate to support a conclusion. G.L.c. 30A, §1(6). When applying the substantial evidence standard, the Court considers the record as a whole. The Black Rose, Inc. v. City of Boston, 433 Mass. 501, 503 (2001). “(T]he substantial evidence test accords an appropriate degree of judicial deference to administrative decisions, ensuring that an agency’s judgment on questions of fact will enjoy the benefit of the doubt in close cases, but requiring reversal by a reviewing court if the cumulative weight of the evidence tends substantially toward opposite inferences.” Cobble v. Comm’r of the Dept. of Social Services, 430 Mass. 385, 391 (1999).
Merits
Callahan argues that CRAB’S decision should be vacated for three reasons: (1) the decision is not supported by substantial evidence and constitutes an error of law; (2) the Panel’s negative certification was erroneous as a matter of law; and (3) the CRAB is not bound by the Panel’s negative certification.
Compensable Personal Injury
To qualify for accidental disability benefits, pursuant to G.L.c. 32, §7(1), an applicant must prove permanent and total disability “by reason of a personal injury sustained or a hazard undergone as a result of, and while in the performance of, his duties at some definite place and at some definite time . . .” G.L.c. 32, §7(1); see also Adams v. Contributory Ret. Appeal Bd., 414 Mass. 360, 365 (1993).
To succeed on his/her application, the applicant must “prove one of two hypotheses: that his disability stemmed from a single work-related event or series of events, or, if the disability was the product of gradual deterioration, that the employment [had] exposed [the plaintiff] to an identifiable condition . . . that is not common and necessary to all or a great many occupations.” Blanchette v. Contributory Ret. Appeal Bd., 20 Mass.App.Ct. 479, 485 (1985) (internal citations and quotations omitted) (alterations in original); see also Zerofski’s Case, 385 Mass. 590, 595 (1982).
Callahan’s claim is premised on the first “hypothesis,” namely, that there was error in CRAB’s conclusion that the alleged disability did not stem from a single work-related event or series of events. Callahan claims that CRAB ignored uncontroverted testimony that established her psychological, emotional, and physical symptoms were directly caused by McNulty in a discrete series of work-related events.
The term “personal injury” is given the same meaning under G.L.c. 32 as under G.L.c. 152. Zavaglia v. Contributory Ret. Appeal Bd., 345 Mass. 483, 486 (1963). General Laws c. 152, §1(7A) provides, “[personal injuries shall include mental or emotional disabilities only where the predominant contributing cause of such disability is an event or series of events occurring within any employment.” Thus, emotional and/or mental disabilities may qualify as personal injuries. See, e.g., Albanese’s Case, 378 Mass. 14, 14-15 (1979) (holding employee is entitled to compensation if incapacitated by a mental or emotional disorder causally related to a series of specific stressful work-related incidents).
*123 This provision, however, also states “[n]o mental or emotional disability arising principally out of a bona fide, personnel action including a transfer, promotion, demotion, or termination except such action which is the intentional infliction of emotional harm shall be deemed to be a personal injury within the meaning of this chapter.” G.L.c. 152, §1(7A). Furthermore, whether a mental or emotional injury arises “principally out of a bona fide, personnel action” is normally within the scope of a DALA magistrate’s competence. See Robinson’s Case, 416 Mass. 454, 459 n.3 (1993).
With CRAB having adopted the DALA magistrate’s findings and rulings, those findings and rulings are CRAB’S for purposes of the appeal. See generally Namay v. Contributory Ret Appeal Bd., supra, 19 Mass.App.Ct. at 461-62. As such, CRAB determined Callahan’s primary allegations were based on “the employer’s valid concern that [Callahan] was not completing her assigned tasks in a timely fashion and was not keeping up with the latest developments in the computer field.” In essence, the CRAB found Callahan’s complaints did not constitute a compensa-ble personal injury because they arose “principally out of a bona fide, personnel action.. .” G.L.c. 152, §1(7A).
In drawing the above conclusions, the DALA magistrate reviewed statements from O’Brien and heard testimony regarding Callahan’s symptoms and diagnoses. In addition, the magistrate heard testimony from Callahan regarding the onset of her various medical complaints. Further, the DALA magistrate acknowledged Callahan’s complaints about McNulty, but she also reviewed the 2004 and 2005 Evaluations, which indicate Callahan had problems keeping up with the new database technology. From those sources the DALA magistrate concluded that there was no compensable personal injury.
There was substantial evidence to support the decision denying Callahan benefits on account of her failure to establish a compensable injury.[1]
The Medical Panel’s Negative Certification as to Disability
Callahan argues the Panel’s conclusion that she was not disabled was based upon an error of law and, thus, the CRAB’s decision relying on that certification should be vacated as not supported by substantial evidence. Specifically, Callahan contends the Panel ignored her significant medical diagnoses the symptoms of which, according to her medical records, coincided with exposure to a hostile work environment at the Medical School.[2]
Unless the medical panel applies an erroneous standard, fails to follow proper procedures, or the certificate is “plainly wrong,” the Board cannot ignore the Panel’s medical findings. See Kelley v. Contributory Ret Appeal Bd., 341 Mass. 611, 617 (1961).
The Callahan Panel consisted of two doctors specializing in psychiatry and one internist. Prior to issuing its negative certification, the Panel conducted a mental examination of Callahan, reviewed her medical records, reviewed statements from Dr. O’Brien and Thurston, and reviewed the medications Callahan was prescribed. The Panel acknowledged Callahan’s medical diagnoses stating, “Callahan has major depression and chronic pain, insomnia, weight loss and gastrointestinal symptoms from several significant medical diseases, including lymphocytic colitis, inflammatory arthritis, and renal disease.” The Panel, however, also found that “(h]er depressive symptoms [were] likely secondary to her major medical problems, and ... if these conditions improved, it is likely her depressive symptoms would also.” The Panel specifically stated it had reviewed both Callahan’s medical history and her job description prior to concluding that “she is capable of performing the essential duties of her job, from a psychological perspective.”[3]
In issuing the negative certification, the Panel appears to have conducted a thorough examination of Callahan and her records. Further, there is no indication that the Panel applied an erroneous standard. It is the Panel’s responsibility to interpret medical evidence. There was substantial evidence to support the Panel’s determination, and the Panel applied lawful standards.
Where a panel has followed proper procedures and correct principles of law, its affirmative answer to the question of injury is a condition precedent to an award of benefits. See Quincy Ret. Bd. v. Contributory Ret. Appeal Bd., 340 Mass. 56, 60 (1959). Thus, CRAB was bound by the Panel’s conclusion, and it committed no error in denying Callahan’s claim.
ORDER
The plaintiffs Motion for Judgment on the Pleadings is DENIED, and the decision below is AFFIRMED.

.L.c. 152, §1(7A) excludes “mental or emotional disabilities arising principally out of a bona fide, personnel action.” However, there is an exception for actions that constitute “intentional infliction of emotional harm.” Nevertheless, none of the conduct Callahan complains of, i.e., the negative performance evaluations, excluding her from the database search, and posting her job description, approaches the level of “reckless[ness], ruthlessness or deliberate malevolence” required to state a claim for intentional infliction of emotional harm. See e.g. Conway v. Smerling, 37 Mass.App.Ct. 1, 8 (1994).

As a general matter, “[t]o qualify for an accidental disability retirement, an employee must be examined by a regional medical panel. See G.L.c. 32, §§6(3)(a), 7(1); 840 Code Mass. Regs. §§10.08, 10.10 (1993). In addition to the examination, the medical panel reviews ‘the pertinent facts in the case, and such other written and oral evidence as the applicant and the employer may present.’ G.L.c. 32, §6(3)(a). ‘At the conclusion of [this process] . . . the panel shall certify to the [retirement] board in writing whether [the] physicians on [the] panel find [ 1 ] that [the employee] is mentally or physically incapacitated for further duty and [2] that such incapacity is likely to be permanent, and . . . shall state further [3] whether or not the disability is such as might be the natural and proximate result of the accident or hazard undergone on account of which retirement is claimed . . .'Id. Certification of affirmative an *124 swers to all three questions is a ‘condition precedent’ to accidental disability retirement. Hunt v. Contributory Ret Appeal Bd., 332 Mass. 625, 627, 127 N.E.2d 171 (1955). The medical panel or its individual members, see 840 Code Mass. Regs. §10.10(2), (9) (1993), must also submit a separate narrative ‘describing in detail the findings and recommendations of the report,’ as well as responding to certain other questions as instructed on the certificate form. 840 Code Mass. Regs. §10.10(9) (1993).” Fairbairn v. Contributory Ret. Appeal Bd., supra, 54 Mass.App.Ct. at 354. Because the Panel here concluded that Callahan was not “mentally or physically incapacitated for further duty,” it did not proceed to certify the second and third statutory issues.

This last phrase is significant. Callahan’s application for accidental disability benefits was premised on the theory that she developed anxiety and depression as a result of hostile work environment. Many of her medical diagnoses, however, pertain to physical conditions/concerns, seemingly not the result of the workplace injury she alleges. The Panel specifically noted that Callahan herself stated she “was psychologically fit to return [to work], but that her physical pain prevents her from being able to do so.”