ERNEST B. MURPHY *vs.* CONTRIBUTORY RETIREMENT APPEAL
BOARD & another.[1]

Suffolk. May 10, 2012. - August 31, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, DUFFLY, & LENK, JJ.

*Contributory Retirement Appeal Board. State Board of Retirement. Retirement. Judge. Public Employment,* Accidental disability retirement.

Overview of the statutory scheme governing retirement systems and pensions in the Commonwealth. [334-337]
Discussion of the standard of review applicable to a decision of the Contributory Retirement Appeal Board. [344-345]
The Contributory Retirement Appeal Board correctly upheld a decision of the State Board of Retirement that a judge who had been diagnosed with post-traumatic stress disorder, major depressive disorder, and various physical ailments brought on by emotional distress that he had suffered following the publication of libelous articles in a newspaper about the judge's performance of his judicial duties, and his subsequent receipt of hate mail and death threats, was not eligible for accidental disability retirement benefits pursuant to G. L. c. 32, § 7, where the judge failed to satisfy his burden of proving that his disabling injuries were sustained while in the performance of his judicial duties. [345-352]

CIVIL ACTION commenced in the Superior Court Department on March 22, 2011.

After transfer to the Supreme Judicial Court for the county of Suffolk, the case was reported by *Cordy,* J.

*James E. O'Connell, Jr.* (*Philip F. Coppinger* with him) for the plaintiff.

*David R. Marks,* Assistant Attorney General, for the defendants.

SPINA, J. Ernest B. Murphy was employed by the Commonwealth of Massachusetts as a Superior Court judge for approximately eight years. Following the publication of libelous articles in the Boston Herald newspaper about Judge Murphy's performance of his judicial duties, and his subsequent receipt of

[1]State Board of Retirement.

hate mail and death threats, Judge Murphy was diagnosed with posttraumatic stress disorder (PTSD), major depressive disorder, and various physical ailments brought on by his emotional distress. Eventually, he was unable to continue performing the essential duties of his job. The State Board of Retirement (board) rejected his application for accidental disability retirement benefits pursuant to G. L. c. 32, § 7, and this denial was upheld by the Contributory Retirement Appeal Board (CRAB). Judge Murphy filed a timely complaint for judicial review under G. L. c. 30A, § 14, in the Superior Court. Shortly thereafter, he filed a petition in the county court pursuant to G. L. c. 213, § 1A, and G. L. c. 211, §§ 4A and 14, requesting that the matter be transferred to this court. A single justice allowed the petition, ordered that the matter be transferred to the county court, and then reserved and reported the case without decision to the full court.

At issue is whether Judge Murphy is entitled to receive accidental disability retirement benefits on the grounds that he is permanently disabled from performing the essential duties of his job "by reason of a personal injury sustained or a hazard undergone as a result of, and while in the performance of, his duties at some definite place and at some definite time." G. L. c. 32, § 7 (1). We conclude that Judge Murphy is not entitled to receive such benefits because he failed to satisfy his burden of proving that the personal injury that resulted in his permanent disability was sustained while he was performing his judicial duties.

1. *Statutory scheme.* Before considering the specific facts of this case, we begin with a brief statutory overview. General Laws c. 32 governs retirement systems and pensions in the Commonwealth. Section 7 (1) of G. L. c. 32 provides, in pertinent part:

"Any member in service . . . who is unable to perform the essential duties of his job and . . . such inability is likely to be permanent before attaining the maximum age for his group *by reason of a personal injury sustained or a hazard undergone as a result of, and while in the performance of, his duties at some definite place and at some definite time* on or after the date of his becoming a

member . . . shall be retired for accidental disability . . ." (emphasis added).

A "member in service" is "any employee included in the state employees' retirement system," G. L. c. 32, § 1, "who is regularly employed in the performance of his duties." G. L. c. 32, § 3 (1) (a) (i).

Once an application for accidental disability retirement benefits is filed by a member in service, a "[r]egional medical panel" comprised of three physicians is convened to examine the member, review the pertinent facts in the case, and determine the member's medical condition. See G. L. c. 32, §§ 1, 6 (3) (a). The panel shall certify to the appropriate retirement board in writing whether "such physicians on said panel find that [the] member is mentally or physically incapacitated for further duty and that such incapacity is likely to be permanent." G. L. c. 32, § 6 (3) (a). In addition, the panel shall state "whether or not the disability is such as might be the natural and proximate result of the accident or hazard undergone on account of which retirement is claimed under [G. L. c. 32, § 7]."[2] *Id.* A medical panel's certificate is not conclusive regarding the ultimate fact of a causal connection, but it represents some evidence on the issue. See *Wakefield Contributory Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 352 Mass. 499, 502-503 (1967); *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 483 (1985); *Shrewsbury Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 5 Mass. App. Ct. 379, 381 (1977). Accidental disability retirement benefits are not allowed unless the appropriate retirement board finds, after its review of the relevant evidence, including the medical panel's certificate of incapacity, and after a review by the public employee retirement administration commission, that "such member is unable to perform the essential

---

[2] This particular requirement pertains to an application for accidental disability retirement benefits, which are different from ordinary disability retirement benefits. Compare G. L. c. 32, § 7, with G. L. c. 32, § 6. With regard to the latter, "[a]ny member in service who is unable to perform the essential duties of his job and . . . such inability is likely to be permanent after completing fifteen or more years of creditable service, . . . upon his written application on a prescribed form filed with the [appropriate retirement] board and with his respective employer, . . . shall be retired for ordinary disability . . . ." G. L. c. 32, § 6 (1).

duties of his job and that such inability is likely to be permanent, and that he should be so retired." G. L. c. 32, § 7 (1). See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 254-255 (1996) (local retirement board, not medical panel, vested with authority to determine whether accidental disability retirement benefits are warranted); *Noone* v. *Contributory Retirement Appeal Bd.*, 34 Mass. App. Ct. 756, 762 (1993). Generally speaking, a retirement board shall make a final determination on accidental disability retirement benefits within 180 days of the date on which the member's application was filed. See G. L. c. 32, § 7 (6).

Any person aggrieved by the decision of a retirement board can appeal that decision to CRAB. See G. L. c. 32, § 16 (4). Once an appeal reaches CRAB, the findings of the local retirement board are "of no particular significance." *Namay* v. *Contributory Retirement Appeal Bd.*, 19 Mass. App. Ct. 456, 461 (1985). CRAB assigns the appeal to the division of administrative law appeals (DALA) for a hearing. See G. L. c. 32, § 16 (4). After a hearing before an administrative magistrate, DALA is to submit to the parties a written decision that is final and binding on the retirement board involved and on all other parties, unless a party objects to such decision in writing to CRAB, or CRAB orders the retirement board to review the decision and take such further action as is appropriate. See *id.* CRAB then is to "pass upon" the appeal within six months after the conclusion of the hearing, and its decision "shall be final and binding upon the board involved and upon all other parties." *Id.*

CRAB is not bound by the DALA administrative magistrate's recommendation. See *Blanchette* v. *Contributory Retirement Appeal Bd.*, *supra* at 483 n.2; *Vinal* v. *Contributory Retirement Appeal Bd.*, 13 Mass. App. Ct. 85, 101-102 (1982). Nonetheless, all subsidiary findings made by the magistrate are entitled to "some deference" by CRAB, and those findings that are based on credibility determinations by the magistrate are entitled to "substantial deference." *Id.* at 101. See *Morris* v. *Board of Registration in Med.*, 405 Mass. 103, 110-111, cert. denied, 493 U.S. 977 (1989). To the extent that CRAB rejects the magistrate's resolution of credibility questions, CRAB's decision should contain "a considered articulation of the reasons under-

lying that rejection." *Vinal* v. *Contributory Retirement Appeal Bd., supra* at 102. See *Lisbon* v. *Contributory Retirement Appeal Bd., supra* at 252-253 ("The only occasion requiring agency explanation for its disagreement with a hearing officer's findings arises when those findings are based upon live witness testimony and credibility determinations made thereon"). See also *Morris* v. *Board of Registration in Med., supra* at 111. Ultimately, the final determination regarding whether an applicant for accidental disability retirement benefits has proved a causal relationship between his permanent disability and a personal injury sustained "as a result of, and while in the performance of," his employment duties, G. L. c. 32, § 7 (1), is the province of CRAB, "based on the facts found and all the underlying evidence, including both the medical and nonmedical facts." *Blanchette* v. *Contributory Retirement Appeal Bd., supra* at 483. See *Lisbon* v. *Contributory Retirement Appeal Bd., supra* at 254. The findings of CRAB, if supported by substantial evidence, will be determinative. See *Namay* v. *Contributory Retirement Appeal Bd., supra.* Once CRAB issues its decision, a party may seek judicial review of that decision in the Superior Court pursuant to G. L. c. 30A, § 14. See *id.* at 462.

2. *Factual and procedural background.* We summarize the facts found by the administrative magistrate with some supplementation from the record. See *Blanchette* v. *Contributory Retirement Appeal Bd., supra* at 480. CRAB drew its abbreviated statement of the facts from the magistrate's detailed findings, which CRAB incorporated by reference, as well as from the exhibits and facts stipulated to by the parties before DALA.

In September, 2000, Judge Murphy was appointed to serve as an Associate Justice of the Superior Court, and consequently, he became a member of the State employees' retirement system. At the time of his appointment, Judge Murphy was in "good psychological health" and "good overall physical health."

Beginning on February 13, 2002, the Boston Herald newspaper published several articles written by its reporter, David Wedge, that were sharply critical of Judge Murphy's performance of his judicial duties. The articles set forth "sweeping allegations of his incompetence to sit on criminal cases, his bias toward defendants, and his open hostility to victims and prosecutors." On

March 7, with the approval and encouragement of his editors, Wedge appeared as a guest on the televised talk show "The O'Reilly Factor," where he discussed an alleged comment that Judge Murphy had made about a rape victim, saying that she should "get over it."[3] As a consequence of all this publicity, Judge Murphy began to receive hate mail, death threats, and threats of violence directed at his family. One death threat was slipped under the door of his chambers and showed a photograph of Judge Murphy from the February 13 Boston Herald article with a target drawn over his face. A bullet hole was drawn on his forehead, and the photograph was inscribed with the words, "YOU'RE DEAD! 'GET OVER IT' YOU BASTARD!" In response to the threats, which were found to be credible, Judge Murphy received State police protection for a period of time.

The impact on Judge Murphy of the publicity, hate mail, and death threats was profoundly negative. He began seeing Dr. Daniel Rutrick, a psychiatrist, on a regular basis and was diagnosed with PTSD and major depression. According to Dr. Rutrick, Judge Murphy "persistently" reexperienced the death threats, causing him to feel intensely fearful and helpless. Judge Murphy also suffered various physical ailments brought on by his emotional distress, including a peptic ulcer, severe irritable bowel syndrome, and gastroesophageal reflux disease.

On June 3, 2002, Judge Murphy sued the Boston Herald and four of its employees for libel. Settlement discussions between the parties were unsuccessful. Following a trial in the Superior Court in January and February, 2005, a jury returned a verdict in favor of Judge Murphy and awarded him compensatory damages in the sum of $2.09 million, which the judge subsequently reduced to $2.01 million.[4]

On February 20, 2005, shortly after the conclusion of the trial, Judge Murphy wrote a letter on official Superior Court stationery to Patrick J. Purcell, the publisher of the Boston

---

[3]The context and substance of what Judge Murphy in fact said were wholly different from what Wedge had reported. The actual remarks by Judge Murphy demonstrated that he "had acted with compassion and prudent regard" to assist the rape victim in putting the matter behind her and restoring her life. See Murphy v. Boston Herald, Inc., 449 Mass. 42, 50-57 (2007).

[4]On appeal, this court affirmed the judgment entered on the jury's verdict, as modified by the trial judge. See Murphy v. Boston Herald, Inc., supra at 43.

Herald, requesting a private meeting that was conditioned on Purcell's bringing and giving to Judge Murphy a cashier's check in the amount of $3,260,000, which essentially would serve as a settlement of the libel action. One month later, Judge Murphy sent another letter to Purcell (on plain stationery but in an official Superior Court envelope) in which he stated that Purcell had "*ZERO* chance of reversing [the] jury verdict on appeal." These letters were published by the Boston Herald on December 21, 2005, generating additional publicity about Judge Murphy that exacerbated his fear of more hate mail, death threats, and threats of violence against his family.

Based on Judge Murphy's actions, the Commission on Judicial Conduct (commission) initiated a complaint against Judge Murphy on January 10, 2006; the Boston Herald filed a separate complaint approximately one month later. On June 26, 2007, the commission initiated formal charges against Judge Murphy, alleging judicial misconduct. A public hearing on the charges took place in October, 2007. On November 19, 2007, a hearing officer issued a report pursuant to G. L. c. 211C, § 7 (8), in which he concluded that the commission had satisfied its burden of proving by clear and convincing evidence, see G. L. c. 211C, § 7 (4), that Judge Murphy had violated several canons of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 440 Mass. 1301 (2003). The hearing officer recommended that Judge Murphy be publicly reprimanded and assessed costs and expenses to reimburse the commission.[5] Having his judicial conduct scrutinized in the press coverage of this matter continued to induce fears in Judge Murphy that he would face additional serious threats, and triggered psychological and physical symptoms that interfered with his ability to perform his judicial duties effectively.

---

[5]On receipt of a report of the Commission on Judicial Conduct (commission), this court concluded that, in accordance with the hearing officer's recommendation, Judge Murphy should be publicly reprimanded and assessed the costs of the proceedings. See *Matter of Murphy*, 452 Mass. 796, 796-797 (2008). Our decision took into consideration this court's resolution of a subsequent complaint that had been brought by the commission against Judge Murphy. See *id.* at 803. In that matter, we accepted the parties' stipulations that Judge Murphy was permanently disabled from performing his judicial duties and would never again sit as a judge in Massachusetts. See *id.*

Around the same time that the commission initiated formal charges against Judge Murphy, an incident occurred in the Superior Court that caused him to leave his job permanently. On July 18, 2007, while presiding over a criminal session, Judge Murphy was asked by a defense attorney to consider a particular sentence on a plea tendered by her terminally ill client in a drug case. Judge Murphy agreed with defense counsel that the proposed disposition would be appropriate in the circumstances. However, his fears that a headline in the Boston Herald the following morning would read, "Murphy Walks Drug Baron," and that hate mail and death threats would resume, rendered him unable to enter the proposed disposition. Judge Murphy realized that he could no longer perform the essential duties of his job, wept, left the court house, and never returned to work.

On July 28, 2007, Judge Murphy submitted a written request for retirement to the Governor pursuant to Part II, c. 3, art. 1, of the Massachusetts Constitution, as amended by art. 58 of the Amendments. Judge Murphy stated that he was "unable to perform [his] responsibilities as an Associate Justice of the Superior Court because of [his] medical condition." His request was supported by medical opinion letters from Dr. Rutrick and Dr. Stephen A. Hoffmann, Judge Murphy's primary care physician since June, 2001. By letter dated August 1, 2007, the Governor's chief legal counsel informed Judge Murphy that the Governor had "declined to act" on Judge Murphy's request to retire.

In early 2008, the Chief Justice for Administration and Management asked Judge Murphy to undergo an independent medical evaluation to determine whether he was permanently disabled due to PTSD, or whether his health issues had resolved so that he could resume his job as a Superior Court judge, with the provision that he handle only civil cases. Dr. Thomas G. Gutheil, a psychiatrist, issued a report on April 8, 2008, setting forth his findings that Judge Murphy was not fit to perform his duties as a Superior Court judge in either criminal or civil sessions. Dr. Gutheil concluded that "Judge Murphy suffers from a combination of personality factors and cognitive deficits that affect his fitness to practice in his profession; and that may

require neurological testing with possible brain imaging studies as well."

On October 3, 2008, Judge Murphy filed an application for accidental disability retirement benefits, stating that he had ceased being able to perform his judicial duties on July 18, 2007, due to "Emotional Conditions, including Anxiety, Depression, Panic Disorder and Post Traumatic Stress Disorder." Judge Murphy identified the reasons for his disability as both "Personal Injury" and "Hazard." He described his fear of ongoing publication of libelous articles by the Boston Herald and his receipt of hate mail, death threats, and threats of violence directed at his family. In support of his application, Judge Murphy submitted a statement and report from Dr. Rutrick. He also submitted a statement from his direct supervisor, the Chief Justice of the Superior Court.

In a letter to the Governor dated December 19, 2008, Judge Murphy "resign[ed] [his] Commission and retir[ed] as [an] Associate Justice of the Superior Court Department of the Trial Court of the Commonwealth, effective immediately."

Judge Murphy's application for accidental disability retirement benefits was referred to a regional medical panel consisting of three psychiatrists. They examined Judge Murphy on April 28, 2009, and unanimously answered all three certificate questions in the affirmative. They opined that he was unable to perform the essential duties of his job, that his incapacity was likely to be permanent, and that his incapacity was "such as might be the natural and proximate result of the personal injury sustained or hazard undergone on account of which retirement [was] claimed." The panel's report stated, among other things, that "notwithstanding [Judge] Murphy's underlying psychiatric and neuropsychiatric vulnerabilities, the work-related stressors connected with the articles in the Herald played a significant role in his deteriorating psychiatric condition." The death threats were identified as "clear psychological stressors." It was the medical panel's unanimous opinion that Judge Murphy "warrant[ed] accidental disability retirement."

The board then requested clarification from the medical panel regarding whether Judge Murphy could perform his duties if he only presided over civil cases, and whether "non-work related

factors [such as Judge Murphy's difficulties with his family] were predominant causes to his psychiatric disability." In response to the board's request, the panel reexamined medical notes and letters that were considered during its original evaluation of Judge Murphy. The medical panel concluded that an opportunity to preside over only civil cases was not available to Judge Murphy and that, in any event, he clearly was "disabled and not able to function in his role." The panel reiterated that Judge Murphy's disability "was caused to a significant degree by his work on the bench."

By letter dated September 3, 2009, the board denied Judge Murphy's application for accidental disability retirement benefits. The denial was based, in part, on a determination by a majority of the board that while Judge Murphy was "incapable of performing the essential duties of his job and his condition [was] likely permanent, his condition was not caused or aggravated by reason of a personal injury sustained or a hazard undergone while in the performance of his duties."

Judge Murphy filed an appeal from the board's decision with CRAB pursuant to G. L. c. 32, § 16 (4). The matter was assigned to DALA, and a hearing was held on January 14, 2010, before an administrative magistrate. At the beginning of the hearing, the parties stipulated that Judge Murphy was disabled, and that such disability was likely to be permanent. Therefore, the issue on appeal was causation. Judge Murphy was the sole witness. By decision dated June 10, 2010, the magistrate reversed the board's determination and concluded that Judge Murphy was entitled to accidental disability retirement benefits. The magistrate stated that Judge Murphy had suffered a compensable personal injury and become permanently disabled as a result of facing death threats and threats to the safety of his family while in the performance of his duties as a Superior Court judge. In the magistrate's opinion, the evidence demonstrated that these threats were the natural and proximate cause of Judge Murphy's serious psychiatric and physical conditions.[6]

---

[6]With regard to the Boston Herald articles, the administrative magistrate stated that their publication was an independent action of the press and not "an accident or hazard undergone by Judge Murphy while performing his [judicial] duties." Therefore, they were not a basis for a compensable personal injury pursuant to G. L. c. 32, § 7 (1).

The board objected to the administrative magistrate's decision in writing to CRAB pursuant to G. L. c. 32, § 16 (4). The board took issue with the magistrate's "conclusion and order," not her factual findings. By decision dated March 3, 2011, CRAB vacated the decision of DALA and affirmed the decision of the board.[7] CRAB pointed out that to be eligible for accidental disability retirement benefits, an applicant must prove his case under either the "personal injury sustained" or the "hazard undergone" rubric of G. L. c. 32, § 7 (1). Although Judge Murphy sought retirement benefits under both theories in his application, CRAB stated that the administrative magistrate had proceeded under the "personal injury" theory, and Judge Murphy had not taken issue with that approach on appeal. CRAB further stated that because the board had acknowledged that Judge Murphy suffered from a "permanent disability," the magistrate rightly noted that the issue in the case was causation.

Based on the record, CRAB was unable to say that substantial evidence supported a conclusion that Judge Murphy received and read all, or any portion, of the threatening communications while in the course of performing his judicial duties, while performing such duties in a place where he worked during his hours of work, or both.[8] Consequently, CRAB stated that Judge Murphy had failed to satisfy his burden of proving that he sustained a personal injury during the performance of his duties.[9] In the alternative, assuming that its determination on the

[7]In its decision, CRAB stated that determinations regarding the credibility of Judge Murphy, the only witness, were "not material to the outcome of the case."

[8]With regard to the administrative magistrate's finding that "[t]he first death threat [Judge Murphy] received was found under the door of his judge's chambers," CRAB stated that the magistrate made no findings regarding "who found this death threat or when and where Judge Murphy read it." CRAB also noted that the magistrate made no findings about "where and when Judge Murphy read and received the many other threatening communications."

[9]As to the magistrate's determination that the Boston Herald articles were not a basis for a compensable personal injury under G. L. c. 32, § 7 (1), see note 6, *supra*, CRAB stated that because Judge Murphy had embraced the magistrate's decision in its entirety, and because the board had not objected to this part of the decision, the ruling on this point was "the law of the case." See *Chase Precast Corp.* v. *John J. Paonessa Co.*, 409 Mass. 371, 379 (1991) (explaining "the law of the case"); *Dalton* v. *Post Publ. Co.*, 328 Mass. 595,

"performance of duties" test was mistaken, CRAB stated that Judge Murphy also had failed to satisfy his burden of proving that he sustained a personal injury "as a result of" his judicial duties. In CRAB's view, the evidence did not demonstrate that the threatening communications, precipitated by Judge Murphy's work on the bench, were the natural and proximate cause of his disabling injury, only that they were a contributing factor (along with the libelous Boston Herald articles, as well as Judge Murphy's underlying personality factors and cognitive deficits). Accordingly, CRAB concluded that Judge Murphy was not entitled to accidental disability retirement benefits.

3. *Standard of review.* It is well established that judicial review of a CRAB decision pursuant to G. L. c. 30A, § 14, is narrow. See *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, 453 Mass. 286, 288-289 (2009). It is not our province "to determine whether the CRAB decision is based on the 'weight of the evidence,' nor may we substitute our judgment for that of CRAB." *Id.* at 289, quoting *Damiano* v. *Contributory Retirement Appeal Bd.*, 72 Mass. App. Ct. 259, 261 (2008). See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 252 n.6, 257 (1996). We set aside a decision by CRAB only where it is legally erroneous or unsupported by substantial evidence. G. L. c. 30A, § 14 (7). See *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, *supra*, and cases cited. Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1. See *McCarthy* v. *Contributory Retirement Appeal Bd.*, 342 Mass. 45, 47 (1961). "Under the substantial evidence test, a reviewing court is not empowered to make a de novo determination of the facts, to make different credibility choices, or to draw different inferences from the facts found by the [agency]." *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Comm'n*, 401 Mass. 357, 369 (1987). We must give due weight to the experience, technical competence, and specialized knowledge of CRAB, see *Retirement Bd. of Salem* v. *Contribu-*

599 (1952). In any event, CRAB agreed with the magistrate's conclusion because the publication of the Boston Herald articles did not result in a personal injury sustained by Judge Murphy while he actually was performing a judicial duty in a place where he worked and during the hours of his work.

*tory Retirement Appeal Bd., supra* at 289, and we are mindful that "retirement law is notoriously complex." *Namay* v. *Contributory Retirement Appeal Bd.*, 19 Mass. App. Ct. 456, 463 (1985). See *Adams* v. *Contributory Retirement Appeal Bd.*, 414 Mass. 360, 367 (1993).

4. *Discussion.* It bears repeating that to be eligible for accidental disability retirement benefits, an applicant must be permanently unable to perform the essential duties of his job "by reason of a personal injury sustained or a hazard undergone as a result of, and while in the performance of, his duties at some definite place and at some definite time." G. L. c. 32, § 7 (1).[10] Judge Murphy had the burden of proving, by a preponderance of the evidence, the requisite causal relationship between his disabling personal injury and a work-related accident or incident. See *Wakefield Contributory Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 352 Mass. 499, 502 (1967); *Lisbon* v. *Contributory Retirement Appeal Bd., supra* at 255. The crux of this appeal is whether CRAB's determination that Judge Murphy's personal injury was not sustained "while in the performance of" his judicial duties is legally erroneous or unsupported by substantial evidence. However, before delving into that issue, we briefly review the matters about which there is no dispute.

First, there is no disagreement that Judge Murphy is permanently disabled from performing the essential duties of his job as a Superior Court judge. At the beginning of the hearing before the administrative magistrate, the parties stipulated to

_____

[10]General Laws c. 32, § 7 (1), includes a notice requirement that states that "no such retirement shall be allowed unless such injury was sustained or such hazard was undergone within two years prior to the filing of such application or, if occurring earlier, unless written notice thereof was filed with the board by such member or in his behalf within ninety days after its occurrence." In her decision, the administrative magistrate noted that Judge Murphy did not file a notice of injury regarding either the Boston Herald articles or the threatening communications. However, she stated that "he filed his application for accidental disability [retirement] benefits within two years of their occurrence and his superiors were aware of these articles and serious threats, so that he satisfied the notice requirements of G. L. c. 32, § 7 (1) and § 7 (3)." CRAB did not mention the matter in its decision. The board neither challenged this aspect of the magistrate's decision in its appeal to CRAB nor raises it in its brief in the present appeal. Accordingly, we do not consider further whether Judge Murphy satisfied the statutory notice requirements.

that fact, and CRAB reiterated in its decision the board's acknowledgment that Judge Murphy suffers from a permanent disability.

Second, there is no dispute that Judge Murphy's severe psychiatric and physical ailments constitute a "personal injury" under G. L. c. 32, § 7 (1). Although the term "personal injury" is not defined in the retirement statute, Massachusetts appellate courts consistently have interpreted the meaning of "personal injury" in accordance with G. L. c. 152, the workers' compensation statute. See, e.g., *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, *supra*; *Adams* v. *Contributory Retirement Appeal Bd.*, *supra* at 361 n.1; *Blanchette* v. *Contributory Retirement Appeal Bd.*, 20 Mass. App. Ct. 479, 482 (1985). A mental or emotional disability has been recognized as a "personal injury" within the meaning of G. L. c. 152,[11] see *Kelly's Case*, 394 Mass. 684, 686 (1985), and cases cited, and, as such, may serve as the basis for a grant of accidental disability retirement benefits. See *Fender* v. *Contributory Retirement Appeal Bd.*, 72 Mass. App. Ct. 755, 761-762 (2008); *Blanchette* v. *Contributory Retirement Appeal Bd.*, *supra* at 485. Here, not only did Judge Murphy suffer severe psychiatric ailments, but he also suffered multiple physical manifestations of his emotional distress.[12]

We now consider whether Judge Murphy's disabling injuries were sustained "while in the performance of" his judicial duties.

---

[11]General Laws c. 152, § 1 (7A), provides, in relevant part: "Personal injuries shall include mental or emotional disabilities only where the predominant contributing cause of such disability is an event or series of events occurring within any employment." In defining the term "personal injury," § 1 (7A) further states that "[n]o mental or emotional disability arising principally out of a bona fide, personnel action . . . shall be deemed to be a personal injury within the meaning of this chapter." Given that Judge Murphy's emotional disability did not arise from a personnel action, this exception is not applicable.

[12]Judge Murphy has argued that CRAB erroneously failed to consider whether he qualified for accidental disability retirement benefits because of a "hazard undergone," rather than a "personal injury sustained." G. L. c. 32, § 7 (1). In its decision, CRAB properly stated that the administrative magistrate proceeded under the "personal injury" prong of the statute, and that Judge Murphy had not taken issue with that approach on appeal. In light of the fact that Judge Murphy became permanently disabled by reason of a "personal injury," we need not consider whether his permanent disability also resulted from a "hazard undergone." Further, and more generally, we do not speculate whether the receipt of death threats by a judge is a hazard of that occupation.

G. L. c. 32, § 7 (1). Judge Murphy contends that CRAB erred in denying his application for accidental disability retirement benefits on the ground that he was not engaged in the performance of his duties when he received a death threat in his chambers during regular court hours. In Judge Murphy's view, his severe psychiatric and physical ailments, brought on by receipt of the death threat, were "transparently and irrefutably sustained 'in the performance of his' judicial duties." Judge Murphy asserts that, in reaching its conclusion, CRAB employed an unreasonably restrictive view of "judicial duties." We disagree with Judge Murphy's position.

While appellate courts have looked to the workers' compensation statute when interpreting the term "personal injury" as it appears in the accidental disability retirement statute, nonetheless, an injured employee's entitlement to benefits under G. L. c. 32, § 7 (1), is significantly different from an injured employee's entitlement to benefits under G. L. c. 152. See *Damiano* v. *Contributory Retirement Appeal Bd.*, 72 Mass. App. Ct. 259, 261-262 (2008). The language of G. L. c. 32, § 7 (1), is "much more restrictive" than that of the workers' compensation statute, *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 109, 111 (1959), because accidental disability retirement benefits "are more generous than those available under ordinary retirement or under a nonservice-connected disability retirement." *Damiano* v. *Contributory Retirement Appeal Bd.*, *supra* at 262. Consequently, the Legislature has created a significantly higher bar for the receipt of accidental disability retirement benefits. See *id.*, and cases cited. See also *Richard* v. *Retirement Bd. of Worcester*, 431 Mass. 163, 164 (2000).

The workers' compensation statute provides for benefits to an employee who experiences "a personal injury *arising out of* and *in the course of* his employment" (emphasis added). G. L. c. 152, § 26. In contrast, G. L. c. 32, § 7, "requires not only that the injuries must result from one's duties but that they must also be sustained 'while in the performance' of [those] duties. The requirements are conjunctive." *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, *supra*. In other words, the causation requirement of G. L. c. 32, § 7 (1), demands that the

claimed injury must be sustained "in the line of duty," that is to say, "during the actual performance of the duties that the employee has undertaken to perform on behalf of the public." *Damiano* v. *Contributory Retirement Appeal Bd.*, *supra* at 263. See *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, 453 Mass. 286, 291 (2009) (benefits awarded under G. L. c. 32, § 7 [1], "only for those who experience a personal injury not merely as a result of the performance of work duties, but *during* the performance of these duties as well"). "Whether the disability complained of is owing to an injury sustained . . . 'while in the performance of' an employment duty is a factual inquiry particular to each case." *Damiano* v. *Contributory Retirement Appeal Bd.*, *supra*.

In light of the distinct language of the accidental disability retirement statute, our jurisprudence over the years has strictly construed the requirements of this statute. See, e.g., *Richard* v. *Retirement Bd. of Worcester*, *supra* at 163-165 (disabling injury suffered by public employee while driving to work location not sustained while engaged in performance of employment duty); *Namvar* v. *Contributory Retirement Appeal Bd.*, 422 Mass. 1004, 1005 (1996) (employee who fell on employer's premises while walking from cafeteria to office to meet with students not injured while in performance of job duties); *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, *supra* (employee who fell on employer's premises while on way home to lunch not injured while in performance of job duties because such interpretation would "stretch" meaning of G. L. c. 32, § 7, "beyond permissible limits"); *Damiano* v. *Contributory Retirement Appeal Bd.*, *supra* (employee seriously injured during "unanticipated horseplay" while at work not injured while in performance of job duties). There is no doubt that "the strict causation requirement of G. L. c. 32, § 7 (1), can yield harsh results for employees who have suffered disabling injuries." *Richard* v. *Retirement Bd. of Worcester*, *supra* at 167. However, "unless and until the Legislature amends the accidental disability retirement statute to relax this requirement, fairness demands that we apply the statute's terms consistently to all claimants." *Id.*

In assessing whether CRAB correctly concluded that Judge Murphy failed to satisfy his burden of proof, we examine the

evidence from two perspectives — whether Judge Murphy was engaged in judicial work (such as preparing for a trial, doing legal research, or the like) during the time that he opened and read the death threat, and whether the act of opening and reading his mail was, in itself, a judicial duty.

First, with regard to whether Judge Murphy was performing judicial duties during the time that he opened and read the death threat in his chambers, Judge Murphy presented no evidence that he was so engaged. The documents before CRAB included our decision in *Murphy* v. *Boston Herald, Inc.*, 449 Mass. 42, 66 (2007), in which this court stated: "In the days following the publication of the February 13 and 14 Herald articles, the plaintiff received boxes of angry letters from people he did not know, many of them explicitly referring to the 'tell her to get over it' comment. Some of the letters contained death threats. The first death threat was slipped under the door of his chambers." As CRAB correctly pointed out, apart from these factual statements, there was no evidence pertaining to "who found this death threat or when and where Judge Murphy read it."[13]

Assuming that Judge Murphy read this death threat in his chambers, there was no evidence whatsoever as to what he was doing when he opened and read it.[14] The mere fact that an employee is in his office during regular work hours does not necessarily mean that the employee is engaged in "the actual performance of the duties that the employee has undertaken to

---

[13]CRAB also noted that "[t]he magistrate made no finding of where and when Judge Murphy read and received the many other threatening communications." In addition to this particular dearth of evidence, it is apparent, based on our review of the record, that no evidence was presented to show that Judge Murphy was performing judicial duties during the time that he received and read these "boxes of angry letters," some of which contained death threats. *Murphy* v. *Boston Herald, Inc.*, 449 Mass. 42, 66 (2007).

[14]In his reply brief, Judge Murphy has included portions of his trial testimony in his libel action against the Boston Herald, in which he describes the circumstances surrounding his receipt of the death threat in his chambers. Contrary to Judge Murphy's assertion, this testimony was not part of the evidence presented to the administrative magistrate or CRAB. What was before them was our decision in *Murphy* v. *Boston Herald, Inc.*, 449 Mass. 42 (2007), but not all of the underlying testimony that was given at trial. Therefore, we do not consider the import of this testimony other than to note that it does not provide any clarifying information about what Judge Murphy was doing at the time he opened and read the death threat.

perform on behalf of the public." *Damiano* v. *Contributory Retirement Appeal Bd.*, *supra*. The employee certainly may be so engaged, but that is not a foregone conclusion. Rather, it is a fact that must be proven by the applicant for benefits. See *Lisbon* v. *Contributory Retirement Appeal Bd.*, 41 Mass. App. Ct. 246, 255 (1996). Here, given the scope of a judge's duties, the inquiry is not about geography (being in the office during work hours), but about employment activities. See *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, *supra* ("benefits may permissibly be awarded only when a disabling injury is sustained during the performance of work duties and not merely as a result of being at work when injured"). Judge Murphy's testimony before the administrative magistrate did not supply the necessary evidence to support his claim for accidental disability retirement benefits. During his testimony, Judge Murphy only stated that he "received death threats, which the State police found were credible and [he] was given a State police protection for a period of time." He made no mention of what he was doing when he received the death threat in his chambers. It was incumbent on Judge Murphy to present evidence to show that at the time he sustained his personal injury, he was engaged "in the performance of" his judicial duties. G. L. c. 32, § 7 (1). He simply did not satisfy this burden of proof.

Second, with regard to whether Judge Murphy was engaged in the performance of his judicial duties by virtue of opening and reading his mail, Judge Murphy presented no evidence to show that this activity was one of his judicial duties. The realm of judicial duties is wide and varied, depending on the individual judge and the court. As part of his application for accidental disability retirement benefits, Judge Murphy submitted a statement from his direct supervisor, the Chief Justice of the Superior Court, in which she was asked to "describe the essential duties that the applicant is required to perform in his or her current position." The Chief Justice's submission included an "Outline of Some of the Basic Responsibilities of a Superior Court Justice." As found by the administrative magistrate, those responsibilities include, among other things, "[e]mpaneling and instructing grand juries, determining and reviewing bail in criminal cases, issuing warrants, greeting potential jurors called to jury duty,

[e]mpaneling juries and conducting jury trials, ruling on the admissibility of evidence in trials, drafting jury charges and instructions on applicable law, and answering questions from jurors during jury deliberations." The opening and reading of mail that has arrived in chambers is not described in the outline as one of the duties of a Superior Court judge.

We recognize that the outline plainly states that its summary of judicial duties "does not purport to be an exhaustive statement of all of the responsibilities that are incumbent upon a Superior Court justice." As such, to the extent that Judge Murphy viewed the opening and reading of mail that arrived in his chambers as one of his judicial duties, he had the burden of producing evidence to support that fact, even if it was simply his own testimony. Judge Murphy produced no such evidence. Contrary to Judge Murphy's suggestion, we do not take judicial notice that the opening and reading of mail by a judge in chambers is a judicial duty because, although it may be for some judges, it may not be for others. See Mass. G. Evid. § 201(b) (2012) (judicial notice of adjudicative facts). See also *Nantucket* v. *Beinecke*, 379 Mass. 345, 352 (1979) ("Matters are judicially noticed only when they are indisputably true"); *Commonwealth* v. *Kirk*, 39 Mass. App. Ct. 225, 229 (1995) (judicial notice "cannot be taken of material factual issues that can only be decided by the fact finder on competent evidence").

Judge Murphy argues that the present case is wholly analogous to *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, 453 Mass. 286 (2009). We disagree. There, an employee of the city of Salem suffered a permanently disabling heart attack at home within one hour after experiencing emotional distress at work when she was told by her supervisor that her job soon would be eliminated. See *id.* at 286-287. Among other issues, we considered whether the employee's heart attack was sustained during the performance of her employment duties, as required by G. L. c. 32, § 7 (1), where it occurred after she had left work for the day. See *id.* at 290. We agreed with CRAB that accidental disability retirement benefits may be awarded only when the disabling injury is sustained *during* the performance of the employee's duties. See *id.* at 291. However, contrary to CRAB, we concluded that the employee's heart attack was

"sustained" during her conversation with her supervisor — an activity that qualified as being engaged in the performance of her work duties — in that the conversation caused the emotional stress that precipitated the employee's heart attack. See *id.* at 290-291. Here, unlike the facts in *Retirement Bd. of Salem* v. *Contributory Retirement Appeal Bd.*, *supra*, Judge Murphy has not presented any evidence to support a conclusion that he sustained a personal injury during the performance of his judicial duties.[15]

5. *Conclusion.* The decision of CRAB is neither legally erroneous nor unsupported by substantial evidence. Accordingly, the case is remanded to the county court where the single justice is to enter a judgment affirming the decision of CRAB to deny accidental disability retirement benefits to Judge Murphy.

*So ordered.*

---

[15]In light of our conclusion, we need not decide whether Judge Murphy's permanent disability came about by reason of a personal injury sustained "as a result of" his judicial duties. G. L. c. 32, § 7 (1). Given that an applicant for accidental disability retirement benefits has the burden of proving both that his personal injury was sustained "while in the performance of" his duties *and* "as a result of" his duties, see *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.*, 340 Mass. 109, 111 (1959), an applicant's failure of proof as to the former is enough, by itself, to result in the denial of benefits.