NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-291                                          Appeals Court

 JACQUELINE OUELLETTE  vs.  CONTRIBUTORY RETIREMENT APPEAL BOARD
                        & others.[1]


                        No. 13-P-291.

     Suffolk.     December 9, 2013. - September 30, 2014.

          Present:  Grainger, Brown, & Carhart, JJ.


Public Employment, Accidental disability retirement, Retirement,
     Retirement benefits.  Public Employee Retirement
     Administration Commission.  Contributory Retirement Appeal
     Board.  Retirement.  Administrative Law, Agency's
     interpretation of statute.  Words, "Member in service."



     Civil action commenced in the Superior Court Department on
December 3, 2009.

     The case was heard by Bonnie H. MacLeod, J., on a motion
for judgment on the pleadings.


     John M. Becker for the plaintiff.
     Kirk G. Hanson, Assistant Attorney General, for
Contributory Retirement Appeal Board & another.

---

     [1] Public Employee Retirement Administration Commission and
Haverhill retirement board.

BROWN, J.  At issue in this appeal is whether the Contributory Retirement Appeal Board (CRAB) properly concluded that the accidental disability retirement allowance of Jacqueline Ouellette was subject to the statutory cap set forth in G. L. c. 32, § 7(2)(a)(ii).

Background.  Ouellette worked for the city of Haverhill as a police officer from January, 1981, until December 5, 2003.  On March 3, 2004, the Public Employee Retirement Administration Commission (PERAC) approved Ouellette's application, submitted through the Haverhill retirement board (board), for a voluntary superannuation (regular) retirement, effective December 31, 2003.  See G. L. c. 32, § 5.

On August 14, 2005, the plaintiff applied for an accidental disability retirement allowance, claiming posttraumatic stress disorder stemming from two incidents that occurred in November, 2003.  After two medical panel reviews, PERAC unanimously certified that Ouellette satisfied all the statutory criteria for accidental disability retirement.[2]  See G. L. c. 32, § 7(1).

---

[2] In 2000, Ouellette was first assigned to the unit responsible for investigating sex crimes.  In October, 2002, Ouellette transferred to the information technology (IT) department, performing IT duties until her retirement. Ouellette claimed in her application for accident disability retirement that in November, 2003, she sustained personal injuries upon learning that one of the sexual assault victims had committed suicide and that a pedophile priest would need to be retried.

On February 27, 2008, upon granting Ouellette's request for accidental disability retirement, effective February 14, 2005, PERAC imposed, pursuant to G. L. c. 32, § 7(2)(a)(ii), a seventy-five percent cap on her disability retirement allowance. General Laws c. 32, § 7(2)(a)(ii), as appearing in St. 1987, c. 697, § 33, provides in pertinent part that "for any employee who was not a member in service on or before January [1, 1988,] or who has not been continuously a member in service since that date, the total yearly amount . . . as determined in accordance with the provisions of clause (i) shall not exceed seventy-five percent of the annual rate of regular compensation as determined in this paragraph . . . ."  PERAC reasoned that the plaintiff was not a member in service continuously until the effective date of her disability retirement allowance, because she became a "member inactive" on December 31, 2003, the date of her superannuation retirement.[3]

---

[3] There are two kinds of membership in the State employees' retirement system.  As herein relevant, a "member in service" is "[a]ny member who is regularly employed in the performance of his duties . . . ."  G. L. c. 32, § 3(1)(a)(i), as amended through St. 1971, c. 94.  The member in service retains that status "until his death or until his prior separation from the service becomes effective by reason of his retirement . . . ." Ibid.  The definition of a "member inactive" includes "[a]ny member in service who has been retired and who is receiving a retirement allowance, any member in service whose employment has been terminated and who may be entitled to any present or potential retirement allowance . . .," or any member in service who is on an authorized leave of absence without pay other than as provided in clause (i) . . . ." [for not more than one year].

Ouellette appealed PERAC's refusal to lift the cap to CRAB.[4] See G. L. c. 32, § 16(4). An administrative magistrate of the division of administrative law appeals (DALA) affirmed PERAC's decision.[5] Following Ouellette's submission of an objection, CRAB adopted the magistrate's findings and issued a final decision affirming PERAC's imposition of the cap. On review, a judge of the Superior Court affirmed CRAB's decision. This appeal ensued.

Discussion. The case turns on the meaning of the provision in § 7(2)(a)(ii), "any employee who was not a member in service on or before [January 1, 1988,] or who has not been continuously a member in service since that date." PERAC interprets the provision as requiring that the employee be a "member in service" continuously until the effective date of her accidental disability retirement. The plaintiff contends that because she was continuously a member in service until her injury the cap does not apply.

_____

G. L. c. 32, § 3(1)(a)(ii), as appearing in St. 1978, c. 523, § 1.

[4] By PERAC's calculations, the sum of Ouellette's annuity and pension allowances after application of the cap was $41,200.92. Absent the cap, Ouellette would have received a total yearly accidental disability allowance of $45,467.88.

[5] Two witnesses testified at the DALA hearing: Ouellette and John Boorack, a senior actuarial analyst. No transcript of their testimony has been provided.

General Laws c. 32, § 7, governs the conditions for an accidental retirement allowance and the amount awarded. Section (7)(1) controls eligibility. Section 7(2), on the other hand, governs the amount that the member can receive once the member has met the conditions set forth in § 7(1). Section 7(2) also limits when the accidental disability retirement allowance can take effect (effective date).

Pursuant to the first paragraph of G. L. c. 32, § 7(2), a member's disability allowance becomes effective on the latest of three possible dates: (1) the date of the injury or the hazard undergone, (2) the calendar date falling six months prior to the date of the submission of the written application for disability retirement, or (3) the date for which the member last received regular compensation.[6] No challenge is made to CRAB's determination that the effective date of Ouellette's accidental disability retirement was February 14, 2005.

Section 7(2)(a), sets out the components of the allowance that the member receives as of the effective date of the retirement. An accidental disability allowance consists primarily of an annuity and a pension, with provision for

---

[6] Accidental disability retirement provides more generous benefits than regular superannuation and ordinary disability retirement and has a stricter standard of eligibility. See Murphy v. Contributory Retirement Appeal Bd., 463 Mass. 333, 347 (2012).

additional upward adjustments not applicable here.  See G. L. c. 32, § 7(2)(a)(i)-(iii).  The normal annual allowance is the sum of "(i) [a] yearly amount of annuity equal to the yearly amount of the regular life annuity specified in clause (i) of Option (a) of subdivision (2) of section twelve . . . [and] (ii) [a] yearly amount of pension equal to seventy-two per cent of the annual rate of his regular compensation on the date such injury was sustained or such hazard was undergone, or equal to seventy-two per cent of the average annual rate of his regular compensation for the twelve-month period for which he last received regular compensation immediately preceding the date his retirement allowance becomes effective, whichever is greater . . . ."  G. L. c. 32, § 7(2)(a)(i)-(ii).  These provisions were contained in the version of § 7(2)(a)(i)&(ii), as amended through St. 1970, c. 644, § 1.  In 1987, the Legislature added after the language just quoted from 7(2)(a)(ii), additional language capping that sum at seventy-five percent of the annual rate of regular compensation for "any employee who was not a member in service on or before January [1, 1988,] or who has not been continuously a member in service since that date" (emphasis supplied), with the added proviso that no individual who was a member in service on January 1, 1988, whose allowance is limited by the seventy-five percent cap shall receive an amount of pension that is less than seventy-two percent of that

individual's regular compensation on January 1, 1988.  G. L.
c. 32, § 7(2)(a)(ii), as appearing in St. 1987, c. 697, § 33.

All parties agree that the starting date of the continuous
service requirement is January 1, 1988; however, they do not
agree on the ending date.  CRAB read the requirement language to
run from January 1, 1988, until the effective date of
Ouellette's accidental disability retirement.  CRAB found that
when Ouellette began receiving her superannuation retirement
allowance in December, 2003, she became a member inactive.  CRAB
concluded that as a result Ouellette was not a member in service
continuously from January 1, 1988, through February 14, 2005,
the effective date of her accidental disability retirement, and
therefore was not entitled to avoid the limitation on her
allowance.

"We review CRAB's decision under a deferential standard and
will reverse only if its decision was based on an erroneous
interpretation of law or is unsupported by substantial
evidence."  Foresta v. Contributory Retirement Appeal Bd., 453
Mass. 669, 676 (2009).  See G. L. c. 30A, § 14(7).  Accordingly,
we give substantial deference to CRAB's interpretation of any
ambiguous statutory text, see Souza v. Registrar of Motor
Vehicles, 462 Mass. 227, 228-229 (2012), "unless [the] statute
unambiguously bars [its] approach."  Goldberg v. Board of Health
of Granby, 444 Mass. 627, 633 (2005).  On the other hand, no

judicial deference at all is given to an erroneous interpretation of a statute. See Herrick v. Essex Regional Retirement Bd., 77 Mass. App. Ct. 645, 647-648 (2010), S.C., 465 Mass. 801 (2013).

We deal here with a claim of legal error.[7]  We conclude that CRAB's interpretation of the statute was reasonable and thus did not constitute an error of law.  The statutory language was susceptible of multiple interpretations.  Faced with an

---

[7] The plaintiff's position is that the Legislature intended, when it enacted the new cap on disability retirement benefits, to exempt from the cap persons who were already employees at the time the amendment was enacted, provided they continued in public service with no break until the date of injury -- that is, the new limitation on benefits was to apply to new employees (an employee "not a member in service on or before [January 1, 1988,]") and to persons who, even if employed on or before January 1, 1988, left or had a break in public service after that date and then returned and were subsequently injured (employee "who has not been continuously a member in service since that date") (the latter were given a lesser protection of a limitation on the cap).  In this view, CRAB's interpretation that the phrase employee "who has not been continuously a member in service since that date" includes not only an employee with a break in service before injury but also an employee who has served continuously since on or before January 1, 1988, up until the date of injury and applies and receives superannuation retirement before applying for disability retirement, adds a category not contemplated by the Legislature.  Further, the plaintiff argues that, in reducing the retirement benefit to the latter, CRAB makes an irrational distinction between two categories of employees, both of whom were employed on or before January 1, 1988, and both of whom served continuously until they were injured (where the only relevant distinction should be the delay in application, which is already taken into account in § 7[2] by a later effective date of disability retirement).  Thus, the plaintiff contends, CRAB's interpretation is not an equally reasonable one and the rule deferring to the agency's choice of an equally rational interpretation does not apply.

ambiguity about which end date the Legislature had in mind for purposes of the continuous service requirement, CRAB logically looked to the surrounding text for meaning. See Franklin Office Park Realty Corp. v. Commissioner of Dept. of Envtl. Protection, 466 Mass. 454, 462 (2013) ("Words grouped together in a statute must be read in harmony . . ."). As with the relationship between the body paragraphs of a unified essay and a thesis statement in an introductory paragraph, CRAB could properly have concluded the end date related back to the effective date. The overall structure of § 7(2) and the use of the effective date to set the relevant time frame in other provisions of that statute supported CRAB's interpretation.[8] Moreover, CRAB's selection of the latest possible date furthered the obvious cost containment purpose of the cap.[9] See id. at 461. While it is possible to construe the statute in the manner urged by Ouellette, who maintains that the date of the injury should always be the

---

[8] As CRAB pointed out, the effective date of the retirement factors into the calculation of "the annual rate of regular compensation," which in turn is used to determine the pension component of the allowance as well as limit on the total annual amount of the allowance. See G. L. c. 32, §§ 7(2)(a)(ii) & 7(2)(c).

[9] Two cost-saving mechanisms are provided by the cap. First, all employees attaining member in service status after January 1, 1988, are subject to the seventy-five percent cap. Second, individuals who attained member in service status on or before that date are also subject to the cap if they are unable to meet the continuous service requirement of the exemption.

operative end date, CRAB's choice between plausible interpretations cannot correctly be said to be wrong.

Nothing in the case law or G. L. c. 32 required CRAB to apply the date of injury as the operative date. It is well-settled that the member must have been in service on the date of the disabling accident (vis a vis the date of the application) in order to be eligible for accidental disability retirement. See State Retirement Bd. v. Contributory Retirement Appeal Bd., 12 Mass. App. Ct. 306, 308 (1981) (Olson case); Leal v. Contributory Retirement Appeal Bd., 42 Mass. App. Ct. 330, 332 (1997). These cases are premised on the legislative purpose expressed in G. L. c. 32, §§ 3(1)(a)(ii) & 3(1)(c),[10] to preserve for members the rights, privileges, and potential benefits for which they qualified during their years of public employment. See Gannon v. Contributory Retirement Appeal Bd., 338 Mass. 628, 631-633 (1959); Boston Retirement Bd. v. McCormick, 345 Mass. 692, 695-696 (1963); Leal v. Contributory Retirement Appeal Bd., 42 Mass. App. Ct. at 332.

---

[10] Section 3(1)(c) of G. L. c. 32 states: "No description of a person having any rights or privileges under the provisions of sections one to twenty-eight inclusive, such as member in service, member inactive, beneficiary or otherwise, shall serve to deprive him of any such rights or privileges. A member shall retain his membership in the system so long as he is living and entitled to any present or potential benefit therein."

The Olson line of cases, relied on by the plaintiff, is inapposite. All of these cases involved member eligibility for accidental disability benefits, a question which is evaluated under a different statutory section (G. L. c. 32, § 7[1]) and language. None provided any analysis of the appropriate calculation of the retirement allowance under G. L. c. 32, § 7(2). Eligibility for benefits is not challenged here. Different principles and policy considerations materially impacted the decisions.[11] We conclude that CRAB did not err by limiting these cases to their holdings.

Consistent with this line of cases, following her superannuation retirement, Ouellette was permitted to secure a more lucrative accidental disability retirement for which she had qualified while a member in service. She was not deprived of any right to a potential retirement allowance or of any other statutory right, privilege, or benefit under G. L. c. 32, §§ 1-28. To the extent that Ouellette argues that she had a reasonable financial expectation of receiving, pursuant to G. L. c. 32, § 7(2)(a), a full accidental disability retirement, the

---

[11] For example, the Gannon and McCormick decisions, upon which the latter two cases were built, were based in part upon the employees' statutory rights under G. L. c. 32, § 14(1) (providing that while living, employees who become entitled to payments under G. L. c. 152 retain all the rights of members in service until their effective retirement dates). As Ouellette was not receiving payments under G. L. c. 152, this provision did not apply to her.

benefits defined as contractual rights and benefits under G. L. c. 32, § 25(5), that are immune from subsequent reduction are limited to those belonging to members of retirement systems who are retired for superannuation.  See G. L. c. 32, § 25(5) (members entitled to contractual rights and benefits with regard to superannuation retirement); Smolinski v. Boston Retirement Bd., 346 Mass. 210, 211-212 (1963) (finding § 25[5] inapplicable to accidental disability retirement as it applies only to those "retired for superannuation").  No cap was placed on Ouellette's superannuation retirement benefits here.  In light of this clear, longstanding precedent predating her employment, Ouellette had no reasonable expectation frustrated by the imposition of the cap on her accidental disability retirement allowance.

No other alleged violations of the standards of G. L. c. 30A, § 14(7), argued by Ouellette, have any substance.

Conclusion.  In the absence of governing precedent, CRAB wrote on a blank slate, bringing its specialized knowledge of retirement law to bear in its interpretation of G. L. c. 32, § 7(2).  Even if we would have made another selection in deciding the issue in the first instance, we find CRAB's construction of the statutory scheme reasonable and not inconsistent with the statutory text or the case law.

It is fair to say that Ouellette's particular circumstances may not have been the type of situation envisioned by the Legislature in fashioning an exemption from the cap.  The statutory language does not provide any exceptions to the continuous service requirement.  We are not at liberty "to add words to a statute that the Legislature did not put there." Retirement Bd. of Somerville v. Buonomo, 467 Mass. 662, 672 (2014).  To ignore CRAB's reasonable interpretation in order to bring Ouellette within the coverage of the exemption would create bad law.  See Leblanc v. Friedman, 438 Mass. 592, 602-603 (2003) (Cowin, J. dissenting).

The judgment of the Superior Court affirming the decision of CRAB is affirmed.

So ordered.
